[No. B162900. Second Dist., Div. Seven. Oct. 23, 2003.]

SLAUSON PARTNERSHIP et al., Plaintiffs and Respondents, v. RICHARD OCHOA, Defendant and Appellant.

1008

**COUNSEL**

Reich, Adell, Crost & Cvitan, J. David Sackman and Carlos Perez for Defendant and Appellant.

Roger Jon Diamond for Plaintiffs and Respondents.

## OPINION

**MUÑOZ (Aurelio), J.**—Richard Ochoa (Ochoa) appeals from an order denying his special motion to strike plaintiffs' complaint under Code of Civil Procedure[1] section 425.16.[2] He contends that free speech activities in protest of an adult strip theater at plaintiffs' minimall are protected by the California Constitution's free speech clause, which allows access to privately owned commercial facilities open to the public for purposes of expressive activity (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341]). Furthermore, he argues that because the standards for obtaining an injunction and prevailing on an anti-SLAPP motion are distinct, the trial court's entry of an injunction against him confining his activities to a public sidewalk cannot be the basis of the denial of his motion to strike.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We recite the relevant facts. Plaintiff Slauson Partnership (Slauson) is the owner of a minimall in Pico Rivera (Mall). In January 2002, Slauson leased a portion of the premises to LeRoy Smith, Glenn Smith, and SGRL Investments, Inc. (collectively Smith). Smith opened a club offering nude entertainment known as Imperial Showgirls (the Club).[3]

The Mall covers approximately 1.26 acres and there are public driveways and sidewalks on all four sides of the lot. The Mall has 16 different-sized leaseable units. Thirteen of the rental units are in a horizontal single-story building with a private sidewalk approximately 13 feet wide in the front. The other three units are detached and located in the parking lot. The Club occupies four units in the center of the main building.

---

[1] All statutory references herein are to the Code of Civil Procedure unless otherwise noted.

[2] Section 425.16 is known as the anti-SLAPP statute and provides for the early dismissal of "strategic lawsuits against public participation." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

[3] Apparently, on January 10, 2002, sheriff's deputies and other representatives of the City of Pico Rivera closed down the Club for failing to obtain the required permit. (The City of Pico Rivera prohibited all adult entertainment within its boundaries.) Smith obtained a preliminary injunction in United States district court (federal action) permitting them to operate the Club and restraining the City's attempts to shut it down. The United States district court expressly found that "non-obscene live adult entertainment is expressive conduct permitted by the First Amendment" and that the City's zoning ordinances concerning the location of adult theatres in the City was unconstitutional. Ochoa requested that the trial court take judicial notice of the Order granting Smith's motion for preliminary injunction in the federal action, but the record on appeal does not contain a copy of the Order. The trial court's statement of decision on the anti-SLAPP motion, however, references the substance of the order.

Ochoa is the pastor of the Lord's Vineyard (Church), a church located in Pico Rivera near the Club. The Church has a membership of about 200, and most members of the Church live within a two-mile radius of the Church. In late February 2002, Ochoa learned that the Club, an adult strip club featuring nude entertainment, had opened in a nearby mall. The Club is located about 1,000 feet from the Church.

Upon learning of the Club's presence, on March 1, 2002, Ochoa organized and held a prayer meeting of Church members. Immediately after the prayer meeting, the Church members walked to the location of the Club to protest its opening. Prior to this protest, the Church had notified the local sheriff's department of their intent to protest at the Mall.

As a result of the Church's ongoing protests at the Club, on April 29, 2002, Slauson filed a complaint for injunctive relief against Ochoa and Does 1 through 5000 to enjoin the protest activities of Ochoa and the Church at the Mall. Slauson alleged that Ochoa and the Church were harassing and intimidating the tenants, employees of tenants, and customers of tenants of the Mall. Slauson alleged that the defendants had obstructed access to parking, shouted at patrons of the Mall, "congregate[d] on the property so as to preclude the businesses from functioning, march[ed], scream[ed], and refuse[d] to leave." The complaint requested injunctive relief enjoining Ochoa from coming onto the Mall property and restricting the protesting to the public sidewalk. The complaint also sought damages and attorneys' fees, but those requests were later withdrawn.

The complaint further alleged that "[i]f Defendants wish to protest any business at the strip mall they should do so in an orderly fashion from the sidewalk leaving appropriate spaces for patrons of the businesses at the strip mall to be able to enter the parking area and patronize the various businesses." Slauson alleged that it was suffering irreparable injury as a result of defendants' conduct and was in danger of losing tenants.

Defendant moved to strike the complaint pursuant to section 425.16. In support of the motion, Ochoa submitted his own declaration, and the declarations of two tenants at the Mall, Yithan Chau (Chau) and Elva Ruiz (Ruiz), and requested the trial court take judicial notice of the federal action.

The Ochoa declaration stated that the opening of the Club had been controversial in Pico Rivera, and the Club was located in a primarily residential area. City officials had attempted to close the Club. The protests at the Mall were directed at the Club only. Ochoa had personally attended "most of the protests against the Club." Although he did not know all of the protestors by name, it appeared to him based upon his conversations with

many of them that they were "middle-aged residents of the City." Many were not associated with the Church, and Ochoa did not know them personally. He admitted taking a "semi-leadership role" in coordinating daily protest activities, but he contended there were other churches and local organizations participating in the protests. An additional aim of the protests was to publicize the Club's violation of local ordinances prohibiting lap dancing and permitting customers to enter through a rear door.

Prior to initiation of the protests in March 2002, Ochoa, LeRoy Smith, other protestors, and a representative of the local sheriff's department sat down to establish "ground rules" for the protests. Ochoa and the other protestors agreed not to block any entrances to the property, not to block any parking spaces, and not to interfere in any unlawful manner with any of the businesses in the Mall. Ochoa handed out a flyer urging protestors to be courteous and not to use noisemakers. At no time has Ochoa observed or encouraged any unlawful conduct at the protest site. He has avoided profanity, physical confrontations, and any other conduct which might be considered un-Christian.

According to Ochoa, on the days that Ochoa had been present at the protests at the Mall, protestors had peacefully patrolled the sidewalk in front of the Club in an area away from the entrance. On the first day of protests, about 300 people showed up, but on average, there have been about eight to 15 protestors every day. The sidewalk is about 13 feet wide and therefore has enough room for protestors to walk past patrons without confrontation. Protestors generally carry signs that are three feet by two feet, and do not hand out bills or leaflets. Some protestors chant, but they do not use bullhorns or other noisemakers because the local sheriffs have asked the protestors not to use them. Those protestors who are not "patrolling" stand about 30 feet away from the Club in what is known as the "safety zone," which does not incorporate any parking spaces and does not block any cars. Because the Club is closed during the day, protestors are generally there at night when many of the tenants of the Mall are closed.

At no time has Ochoa or any of the other protestors expressed an intent to harm anyone. The purpose of the protests is to let the owners of the Club know that they are not welcome in the area. That is why the protests are held in front of the Club, and not on the sidewalk outside the Mall. The Club is only a short walking distance from schools and churches in the community. During the protests, the protestors have patronized many of the shops in the Mall, including a donut shop, a haircutting salon, and a 7-Eleven.

The local sheriff's department has sent over sheriffs on a daily basis to supervise the protest activity, and to ensure the safety and peace. If there had

been any complaints or incidents, the sheriffs would have intervened and put and end to the protesting. So far, the sheriffs had monitored but not interfered with the protestors' activities.

Prior to the commencement of the instant action, Ochoa had never been contacted by the Mall's owners and asked to leave. Slauson's property manager, Brian Gordon, once asked Ochoa if he had a job or somewhere better to spend his time. Ochoa was aware of no tenant displeased with the protest activity, other than the owners of the Club. Ochoa understood the allegations of the complaint to ask the protestors to stand on a public sidewalk facing the boundaries of the Mall, which was about 100 feet from the Club. Ochoa did not believe this would be safe as the sidewalk was narrow and bordered a busy street. In addition, the public might get the impression the protestors were calling for a general boycott of the Mall, which was not the case.

According to Ochoa, the instant lawsuit had a "chilling effect" in that several protestors had approached him and expressed some concern that they, too, could be the targets of a lawsuit. The number of protestors has dropped steadily since April 30, 2002, the date Ochoa was served with the complaint. The fact the complaint names 5000 "Doe" defendants implies that Slauson will include as many protestors as possible.

The declaration of Yithan Chau stated that he was the owner of Homestyle Donuts, located at the Mall. He had witnessed some of the protest activity. No protestor had interfered with his business, nor had he seen any protestor abuse customers or engage in violence. Most of the protestors had been friendly and peaceful. He has not observed any other tenant of the Mall to ask the protestors to leave.

The declaration of Elva Ruiz stated that she was the owner of a beauty salon at the Mall. She had witnessed some of the protest activity, and no protestor had interfered with her business. She had not seen any protestor abuse any customer or engage in any violence. Most of the protestors had been friendly and peaceful. She was not concerned that the protest would interfere with her business, and has not asked any protestors to leave.

In opposition to the motion to strike, Slauson submitted the declarations of Roger Jon Diamond (Diamond), LeRoy Smith, and Brian Gordon (Gordon). These declarations paint a very different picture.

Diamond, who is Slauson's attorney, personally attempted to serve the complaint on Ochoa. Diamond described the scene: "[Ochoa] was at the center along with a large group of persons who were engaging in picketing,

demonstrations, and so forth. When I attempted to hand a copy of the Summons and Complaint to Mr. Ochoa he refused to take them. I touched his hand with the papers but he allowed them to drop to the floor. He then walked by me and told me that he had not been served. I told him that he had. He was not cooperative." Nonetheless, an answer to the complaint was filed on behalf of Ochoa.

Diamond prepared a set of proposed rules and regulations to govern protesting activity at the Mall, which were submitted in connection with some interrogatories propounded to Ochoa.

In an attempt to resolve the matter, on June 28, 2002, Diamond, Glenn Smith and LeRoy Smith met with Ochoa and Ochoa's attorneys. The Smiths and Diamond made proposals concerning the protesting. Instead of agreeing to any terms, Ochoa's attorneys served Diamond with a motion to strike. Furthermore, according to Diamond, Ochoa's terms for settlement were unreasonable. He wanted to have at least 15 persons walking immediately in front of the Club, and refused to agree that other persons could not remain where they were presently "loitering and using the property's electricity." This stance, in Diamond's opinion, evidenced the fact that Ochoa was acting for more than just himself and had the authority to control other persons' actions. Furthermore, if the lawsuit were only designed to harass, there would have been no point to meeting with Mr. Ochoa.

Subsequent to the meeting, two of Ochoa's "henchmen" were caught on videotape vandalizing LeRoy Smith's vehicle. The sheriff's department arrested the two men and the videotape was taken by the sheriff's department.

LeRoy Smith's declaration stated that Ochoa's declaration was misleading in that it attempted to create the impression that the protests have been peaceful. LeRoy Smith has been at the Mall every day since the Club opened. For the first three months, Ochoa was there every day and in Smith's opinion was the "organizer" of the protestors. In fact, Ochoa acknowledged to Smith that he was the leader and organizer of the protesters. Smith stated that since the Club opened, the protestors have been protesting in a way that "exceeds reason." They have engaged in vandalism, battery, theft and other criminal activities. On March 15, 2002, as Smith drove his vehicle into the parking lot, he was surrounded by protestors. Three of the protestors stopped his vehicle and began beating on it. Smith opened the door of his vehicle to get out and was attacked by the protestors, who struck him. The protestors caused over $1,000 in damage to Smith's vehicle.

The protestors also vandalized the Club building, destroying the locks to the entrance. It cost $275 to repair the locks. Sometime in mid-June 2002, the

protestors pulled up six vehicles to the front of the theatre and leaned on their horns for approximately 15 minutes. The Club had to shut down because of the noise. Under Ochoa's guidance, protestors ran up to patrons of the Club and shouted in their faces. They ran up to vehicles driven by patrons and refused to let them exit their vehicles. On average, there are about 15 picketers who stand in front of the Club. Protestors have placed signs in front of the Club announcing that it is "closed." A photograph attached to Smith's declaration showed Ochoa at the Mall with a megaphone.

Gordon, the property manager for Slauson, stated that since the Club opened, the protestors have literally "camped out" at the Mall, bringing tables and chairs, which they set up in the center of the parking lot. The protestors have plugged into electrical outlets, taking electricity from the Mall. They take up many parking spaces and generally interfere with the business of the Mall. Slauson would have allowed peaceful protests on the Mall property, but given that the protestors have engaged in vandalism and are stealing electricity, the Mall does not want them there at all.

At the June 28, 2002 meeting, the Smiths offered to have five peaceful protestors picketing, but insisted that other picketers leave the property. The protestors were taking up parking spaces and making life "miserable" for most of the other tenants. Slauson does not want to lose the Club as a tenant. Ochoa and his group were attempting to intimidate the Club into leaving.

Ochoa objected to Slauson's evidence on the grounds it lacked foundation, was conclusory, consisted of hearsay, and violated the confidentiality of the settlement conference.[4]

At a hearing held July 31, 2002, the parties stipulated to an injunction. The injunction provided in relevant part that a limited number of protestors could be present (starting with five and increasing to 12 after September 3, 2002) on the 13-foot wide private sidewalk, they would remain more than eight feet

---

[4] On appeal, Ochoa asks this court to consider his evidentiary objections to Slauson's declarations even though he concedes he did not obtain any ruling on the objections in the trial court. In connection with a summary judgment motion, "[t]rial courts have a duty to rule on evidentiary objections. Part of the judicial function in assessing the merits of a summary judgment or adjudication motion involves a determination as to what evidence is admissible and that which is not." (*City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 784 [97 Cal.Rptr.2d 140].) Where the trial judge fails to rule on objections to evidence presented at a summary judgment motion, the objections are deemed waived on appeal. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on other grounds by *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Accordingly, because a motion to strike is akin to a summary judgment motion (see discussion, *post*), in reviewing the trial court's order denying the motion, we consider all the evidence presented by the parties.

from the Club, they would only protest when the Club was open, they would remain a certain distance from the Club, they could not engage in physical contact with any patrons or employees of the Club, there would be no use of bullhorns, no shouting and no sitting. Only "normal polite protest conduct" would be allowed. Ochoa would maintain a list of the persons who would comprise the authorized protestors, the list would be maintained for seven days and Ochoa would make it available to the court or the sheriff's department upon request. Slauson would be entitled to eject those persons not on the list, and Slauson would be entitled to videotape the Mall and would be required to maintain the videotape for seven days. Protestors would not be permitted on the Mall premises when they were not protesting or patronizing businesses at the Mall. The injunction did not restrict activity on the public sidewalks bordering the Mall. The injunction was to remain in effect for two months, a further hearing date was set for October 3, 2002, and the motion to strike was continued. The injunction was signed by the court on August 15, 2002.

On September 3, 2003, Slauson returned to court to seek a modification of the injunction. Two protestors had been arrested. A videotape was played for the court of events occurring on August 20, 2002. The videotape depicted conduct from August 1, 2002, to August 16, 2002, and showed protestors on the private sidewalk "constantly yelling and shouting," "periodically blowing whistles in front of the theater loudly enough that the nose could be heard inside the club despite the high volume music that was being played therein." Protestors were shown marching inside the eight-foot limit, there were more than five protestors on the sidewalk, and sometimes there were additional protestors in the parking lot. Ochoa brought video cameras onto the Mall premises to videotape patrons of the Club.[5]

Ochoa argued that the activities depicted on the tape were in conformity with the stipulated injunction. Ochoa contended that not all of the people depicted in the videotape were under his control. The trial court noted that it observed yelling and harassment. The court took the matter under submission, but before doing so limited the number of protestors to five.

On September 12, 2002, a hearing was held and another video was played for the court. This videotape depicted protestors continuing to shout and blow whistles, although most of the protestors, but not all, were now stationed on the public sidewalk. However, the protestors were engaging in the noisemaking activity well past midnight. The protestors were placing their video cameras on the private sidewalks with signs that read, "You are being videotaped, it can be used against you in a court of law."

---

[5] These descriptions of the videos are taken from the court's statement of decision denying the SLAPP motion.

Ochoa then testified that he believed LeRoy Smith was angry because of the lack of business at the Club and was attempting to instigate an altercation with the protestors. With respect to protestors depicted on the tape yelling from the sidewalk, Ochoa denied having any control over their activities. Ochoa admitted he had taken a leadership position to the extent that he keeps a list of the authorized protestors. The only person who would be in a greater leadership role was "God Almighty Himself." Ochoa admitted, however, that he had told the protestors they could protest from the sidewalk.

The trial court found that the stipulated injunction did not limit protestors on the public streets surrounding the Mall. The videotapes showed that "on many occasions the preliminary injunction was violated by loud and raucous shouting by the protestors." More than five protestors had gathered, made confrontational approaches to patrons in violation of the eight-foot limit, videotaped patrons entering the Club, and parked cars at the Mall. The court noted that it was disturbed to observe on the latest video that protestors were shouting and whistling past midnight, which the court found unreasonable.

Brian Gordon testified that the Mall covered 1.2 acres. The driveway entrance to the Mall is approximately 250 to 300 feet away from the Club. There are two entrances to the Club. There are approximately 150 to 200 parking spaces. If a protestor wanted to communicate with a patron of the Club, it would be possible to do so from the driveway. Slauson has received numerous complaints from other tenants in the Mall since the protests began concerning the protestors and the amount of traffic. The protestors occupy a lot of the parking, and one tenant asked for a rent abatement because of the parking problem. The Club is open from 6:00 p.m. to 1:00 a.m.

The court noted that the case presented a "delicate balance between competing first amendment rights and property rights" and that the protestors wanted to express their disapproval of the adult entertainment at the Club, while the Club owners had their own First Amendment rights to present such entertainment. The first issue raised by the circumstances was the extent to which the property fell with in the public forum situation of *Robins,* and the recent cases of *Costco v. Gallant* and *Trader Joe's.*[6] The second issue raised was the extent to which the message of the protestors could be presented as effectively elsewhere. The court noted that the protests were site specific, i.e., directed at the Club, and in that fashion the case was similar to an abortion clinic. A third issue was the extent to which the private property fell within the public forum of *Robins* and the extent to which the private property owner could limit the expression by imposing reasonable regulations on the

---

[6] *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425 [86 Cal.Rptr.2d 442], and *Costco Companies v. Gallant* (2002) 96 Cal.App.4th 740 [117 Cal.Rptr.2d 344].

protestors while they were on Mall property. The last issue was the scope of the trial court's power. Even if the court concluded the protestors were on private property and they were in fact harassing patrons, there were questions about the court's ability to impose restrictions in terms of conduct and location.

The court continued the matter to September 20, 2002, and stated that it would consider the tabled motion to strike at the same time.

At the continued September 20, 2002, hearing, the court announced that it would hear the motion to strike first. ■ A motion to strike entails a two-part test: first, the defendant must establish that the defendant's conduct falls within the protections of the anti-SLAPP statute, and second, the plaintiff must establish they have a probability of success on the merits. The court noted that the first prong had been met, and that the parties did not contest that issue, and on the second prong, the plaintiffs have established a probability of success. The court noted that Ochoa had clearly violated the terms of the injunction, and if there was not an orderly protest, the court could modify the injunction to exclude Ochoa from the Mall property. The court noted that Ochoa did not just want to protest, they wanted the Club to leave the Mall, and that the protestors would do almost anything short of activities that would subject them to arrest to accomplish that purpose. During argument on the motion, the court pointed out that if Ochoa had honored the terms of the injunction, the parties would not be before the court.

The parties disputed whether Slauson could amend its complaint subsequent to the filing of the motion to strike to remove the allegations of damages, and disputed whether only precomplaint or postcomplaint evidence to be considered in ruling on the motion. Ochoa contended that in order to prevail on the second prong, Slauson must prove its entitlement to damages. Ochoa also objected to any evidence submitted in connection with the injunction being used to evaluate the merits of the SLAPP motion.

Ochoa argued that the injunction could work well if the parties followed the spirit of the injunction and the parties communicated with each other. The injunction could be modified to provide for mediation procedures to be followed out of court. Slauson argued the only reasonable relief the court could grant would be to exclude Ochoa from the property. Ochoa has demonstrated that the protestors cannot live by a very reasonable injunction. All of the cases governing the issue pertain to peaceful and orderly protests, as distinguished from the circumstances of the instant case. Thus, the court need not address the issue of whether the Mall was public or private forum.

The court denied the motion to strike. The court also modified the preliminary injunction to exclude the protestors from the Mall, and set a

hearing on a permanent injunction for 30 days following the hearing. During that time, if the protestors demonstrated that they could behave and engage in peaceful protesting, the court would allow them back into the Mall.

On October 11, 2002, the trial court issued a well-reasoned and detailed written statement of decision. On the first prong of the SLAPP motion, the court found that Ochoa's activities were activities in furtherance of free speech rights and that the opening and continued operation of the first adult entertainment club in Pico Rivera was a matter creating intense public opposition and media attention, satisfying the requirements of Code of Civil Procedure section 425.16, subdivision (e)(3), the first prong of a SLAPP motion.

On the second prong, probability of success on the merits, the trial court found that although Ochoa's activities were in furtherance of free speech rights, the stipulated injunction contained reasonable time, place and manner restrictions and therefore it was reasonably probable that Slauson would prevail on the merits. In reaching this result, the trial court found that Slauson had withdrawn its damages and attorneys' fees claim and rejected Ochoa's argument that Slauson was required to establish damages. Furthermore, although free speech activity may be required on property open to the public pursuant to *Robins v. Pruneyard Shopping Center, supra,* 23 Cal.3d at pages 908–911, Slauson had established that it would be entitled to an injunction denying Ochoa all access to the property because speech may be limited on property where public access is restricted, based on *Golden Gateway Center v. Golden Gateway Tenants Association* (2001) 26 Cal.4th 1013, 1022–1031 [111 Cal.Rptr.2d 336, 29 P.3d 797]. Based upon the nature of the site, Slauson had only invited the public to the Mall for the purposes of purchasing goods, rather than to stroll about and congregate, dine, or meet other persons, as in *Robins.* The court found that the original stipulated injunction comported with the standards set forth in *Robins,* and Ochoa's violation of that injunction's terms supported a modification barring all access to the Mall, relying on two cases barring expressive activity at single stand-alone stores, *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425, 435 [86 Cal.Rptr.2d 442], and *Costco Companies v. Gallant* (2002) 96 Cal.App.4th 740, 744 [117 Cal.Rptr.2d 344].

The trial court reviewed the terms of the stipulated injunction, and found it contained reasonable time, place and manner restrictions. The court found that the "stipulation was a generous accommodation by [Slauson] as to the protestors' free speech interests especially in light of the evidence of the protestors' prior interference with the operations of the theater and the mall." On the other hand, when the parties returned to court after the injunction went into effect, there was evidence that the protestors had engaged in numerous and continuous violations of the terms of the injunction, and

interfered with the Club's use of the premises. The court therefore granted the request to modify the preliminary injunction to prohibit all protest activity on the premises and limited access to the Mall for the sole purposes of purchasing goods and services and related activities.

## DISCUSSION

Ochoa contends Slauson has failed to demonstrate a reasonable probability it would prevail on the merits. First, this burden cannot be met by showing it is entitled to an injunction because an injunction is a remedy, not a cause of action. Furthermore, the preliminary injunction was not based on the constitutional balancing required for a restraint of speech, but a stipulation of the parties; this injunction was modified upon a finding that the protestors (not necessarily Ochoa) had violated the injunction. Second, even reading a cause of action for trespass or nuisance into the complaint, Slauson cannot demonstrate a reasonable probability of success on the merits of those causes of action. As an evidentiary matter, Slauson's conclusory declarations filled with hearsay fail to establish the necessary showing because the scant amount of evidence that is not hearsay either does not relate to Ochoa or concerns events occurring after the complaint was filed.

Slauson argues that the Mall does not constitute a large regional shopping center such as that in *Robins,* but is more akin to the stand-alone Costco stores, where free speech activity could be banned. Furthermore, even if Ochoa had a right to be present at the Mall, he and the other protestors forfeited that right by their vandalism and disruptive behavior, and there is substantial evidence in the record that Ochoa was the leader of the protest group. Lastly, the trial court was not precluded from relying on evidence of events occurring after the filing of the complaint but prior to the hearing on the motion to strike.

I. *THE TRIAL COURT DID NOT ERR IN CONSIDERING POSTCOMPLAINT FACTS OR IN USING THE EVIDENCE SUPPORTING THE STIPULATED INJUNCTION TO RULE ON THE SPECIAL MOTION TO STRIKE.*

Section 425.16, the anti-SLAPP statute, provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Under the statute an " 'act in furtherance of a person's right of petition or free speech under the

United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

■ In evaluating an anti-SLAPP motion to strike, courts employ a two-step analysis. First, the defendant must make a prima facie showing that the lawsuit arises from the defendant's exercise of free speech or petition. (§ 425.16, subd. (b); *Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App. 4th 921, 928 [116 Cal.Rptr.2d 187] (hereafter *Kajima*).) The burden then shifts to the plaintiff to show that there is a probability the plaintiff will prevail on its claims. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 654–655 [49 Cal.Rptr.2d 620].) A "probability of prevailing is established if the plaintiff presents evidence establishing a prima facie case which, if believed by the trier of fact, will result in a judgment for the plaintiff." (*Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1188 [121 Cal.Rptr.2d 794].) Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Our standard of review of the trial court's ruling granting the motion to strike is de novo. (*Kajima, supra*, 95 Cal.App.4th at p. 929.)

■ Courts have noted that the second prong of a motion to strike is akin to a summary judgment motion. (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 843 [111 Cal.Rptr.2d 582].) Where a motion to strike involves a preliminary injunction, the court's task in evaluating the motion cannot be simply a "rerun of the preliminary injunction question." (*Ibid.*) When ruling on a preliminary injunction, the court considers " 'the likelihood that plaintiff will prevail at trial,' " while in ruling on a motion to strike, the court must consider whether plaintiff has "made a prima facie showing of facts which, if proved at trial, support a favorable judgment." (*Ibid.*) In *Lam,* the plaintiff used the same evidence both for opposing the motion to strike and for obtaining an injunction. Primarily because the sole defendant was not involved in much of the tortious conduct, the court found that there was no such prima facie showing, although there was enough to support an injunction against the protestors generally. (*Ibid.*) *Lam,* however, does not stand for the proposition (and does not itself purport to stand for the proposition) that the factual

showing for a preliminary injunction can *never* be sufficient to defeat a motion to strike. In the instant case, as we discuss *infra,* the showing has been more than made.

■ Furthermore, nothing in the statute or case law suggests that the factual analysis for ruling on the motion must be frozen in time on the date the complaint is filed. We note that although discovery is stayed until the notice of entry of the order ruling on the motion, discovery may be conducted if good cause is shown, and such discovery is limited to the issues raised in the special motion to strike. The purpose of this limitation is only to further the purposes of the special motion to strike, i.e., to minimize the costs and burdens of unmeritorious litigation directed at free speech rights. (§ 425.16, subd. (g); *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, supra,* 99 Cal.App.4th at p. 1189.)

Ochoa relies on *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068 [112 Cal.Rptr.2d 397], which held that a complaint could not be amended after a motion to strike is filed, for the proposition that evidence occurring after the complaint cannot be used to oppose the motion. Allstate sued its insureds alleging an insurance scam arising from fraudulent, inflated and exaggerated medical bills, the performance of unnecessary treatments, the use of unlicensed physical therapists, and the like. Allstate sought injunctive relief and disgorgement of unlawful profits under the Unfair Practices Act (Bus. & Prof. Code § 17200 et seq.). The insureds cross-complained, alleging defamatory conduct on Allstate's part. (*Simmons v. Allstate Ins. Co., supra,* at pp. 1070–1071.) Allstate brought motion to strike the cross-complaint; at the hearing on the motion, the insureds asked for leave to amend their cross-complaint, arguing that a SLAPP motion was akin to a demurrer and leave to amend should be liberally granted. (*Id.* at pp. 1072–1073.) *Simmons* denied leave to amend on the grounds that a SLAPP motion was more like a summary judgment motion because of the evidentiary showing required and the shifting burdens. (*Id.* at p. 1073.) The SLAPP statute itself made no provision for permitting amendments, and as a policy matter, permitting amendments once the initial prima facie showing has been made would undermine the statute. "Instead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious nature of the suit through more artful pleading. . . . [¶] By the time the moving party would be able to dig out of this procedural quagmire, the SLAPP plaintiff will have succeeded in [the] goal of delay and distraction and running up the costs of his opponent." (*Id.* at pp. 1073–1074.)

■ Because further development of the factual record is contemplated by the anti-SLAPP statute, and not expressly prohibited by it, we find that it was

not error for the trial court to rely on evidence of events occurring subsequent to the filing of the complaint. *Simmons* is also distinguishable because Ochoa, not the SLAPP suit plaintiff, is the one amending the facts with his egregious conduct. Indeed, to hold otherwise would permit Ochoa to circumvent the purposes of the very motion which he has brought. He could obtain a false victory in the trial court based on phony compliance with the injunction, and then flout its terms (as he did here), which would result in the necessity of the other party proceeding with the expenses of discovery and the filing of additional motions in order to curtail the objectionable behavior. This is hardly speedy or cost-effective.

## II. *SLAUSON DEMONSTRATED ITS ENTITLEMENT TO AN INJUNCTION AND THUS DEMONSTRATED IT HAD A REASONABLE PROBABILITY OF PREVAILING ON THE MERITS.*

In *Robins v. Pruneyard Shopping Center, supra,* 23 Cal.3d 899 [153 Cal.Rptr. 854 592 P.2d 341], the California Supreme Court held that solicitation of signatures on a petition to the government at a privately owned shopping center was an activity protected by the California Constitution.[7] (*Id.* at p. 902.) The shopping center in *Robins* covered 21 acres, five of which were devoted to parking, the other 16 of which had walkways, plazas and buildings containing 65 shops, 10 restaurants, and a cinema. The shopping center had a policy of not permitting the circulation of petitions or other public expressive activity that was not directly related to commercial purposes. The plaintiffs in *Robins* set up a card table in a corner of the mall's center courtyard and sought to discuss their concerns and solicit signatures for a petition to be sent to the White House. They were peaceful and they were well-received by the patrons of the shopping mall. Nonetheless, security guards employed by the shopping mall asked them to leave. (*Id.* at p. 902.)

*Robins* noted that "[s]hopping centers to which the public is invited can provide an essential and invaluable forum for exercising [free speech] rights." (*Robins v. Pruneyard Shopping Center, supra,* 23 Cal.3d at p. 910.) Therefore, *Robins* found the California Constitution conferred greater free speech rights than the federal Constitution, declining to apply the rationale of *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219] that private property owners could in all instances exclude expressive activity where there were alternative avenues for that activity. (*Robins v. Pruneyard Shopping Center, supra,* at pp. 904–905.) Instead, *Robins* relied on a long line of California cases finding free speech rights on a private sidewalk of a grocery store (*In re Lane* (1969) 71 Cal.2d 872, 878 [79 Cal.Rptr. 729, 457

---

[7] Article I, section 2 of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

P.2d 561]), in front of a bakery in a shopping center that was the subject of a labor dispute (*Schwartz-Torrance Investment Corp. v. Bakery & Confectionary Workers' Union* (1964) 61 Cal.2d 766, 768 [40 Cal.Rptr. 233, 394 P.2d 921]), and at a railroad train station that contained a restaurant, snack bar, cocktail lounge, and magazine stand (*In re Hoffman* (1967) 67 Cal.2d 845, 852–853 [64 Cal.Rptr. 97, 434 P.2d 353]).

*Robins* found that private property interests must be balanced against free speech rights of peaceful expression. (*Robins v. Pruneyard Shopping Center, supra,* 23 Cal.3d at pp. 910–911.) "By no means do we imply that those who wish to disseminate ideas have free rein. We noted above Chief Justice Traynor's endorsement of time, place and manner rules. (*In re Hoffman, supra,* 67 Cal.2d at pp. 852–853.) . . . 'As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation].' " (*Robins v. Pruneyard Shopping Center, supra,* 23 Cal.3d at pp. 910–911, citing *Diamond v. Bland* (1974) 11 Cal.3d 331, 345 [113 Cal.Rptr. 468, 521 P.2d 460] (dis. opn. of Mosk, J.).)

In *Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th 1013, the court addressed the unanswered question of *Robins:* "whether California's free speech clause protects against only state action or also against private conduct." (*Id.* at p. 1020.) *Golden Gateway* addressed this issue in the context of whether a tenants association had the right to distribute its newsletter in a privately owned apartment complex. (*Id.* at p. 1016.) The complex at issue consisted of four high-rise apartment buildings containing 1,254 units. There were retail establishments on the ground floor of the complex, but they were separate from the residential units and did not have access to the residential portion of the complex. There were 24-hour roving security patrols, and building policy banned solicitation in the complex. (*Id.* at pp. 1016–1017.) In 1982, a group of tenants had formed a tenants association and for 11 years had distributed a newsletter without objection from the manager of the complex. However, in 1993, the manager asked the association to stop distributing the newsletters, citing the prohibition against solicitation in the buildings. After some discussion, the parties agreed that the tenants association could distribute the newsletters under the apartment doorways provided it was done in "a reasonable manner." The parties, however, did not discuss what "a reasonable manner" entailed. In 1995, the landlord hired a new building manager. The new manger asked the tenants association to scale back its newsletters. Thereafter, a new policy was issued that completely banned the newsletters. However, the tenants' association continued to distribute its newsletter. The landlord filed a complaint

seeking an injunction and declaratory relief, and the tenants association cross-complained. (*Id.* at pp. 1017–1018.)

*Golden Gateway* noted that while under the federal Constitution the tenants association had no right to distribute its newsletter (see, e.g., *Hudgens v. NLRB* (1976) 424 U.S. 507, 519–520 [47 L.Ed.2d 196, 96 S.Ct. 1029] [union picketers had no federal constitutional free speech rights to expressive activities at privately owned shopping mall because actions of the owner of privately owned shopping did not constitute state action]; *Lloyd Corp. v. Tanner, supra,* 407 U.S. 551 at p. 570 [political leafletters had no federal constitutional free speech right in privately owned shopping mall], under the California Constitution the matter was a different question because the California Constitution was more definitive and inclusive than the federal Constitution (Cal. Const., art. I, § 2, subd. (a).) (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1019.) However, there was no state constitutional right to distribute newsletters to the tenants of the complex. (*Id.* at p. 1022.) *Golden Gateway* reached this result after observing that *Robins* had overlooked the state action requirement of the California Constitution in reaching its result, and concluding that the California Constitution contained a state action requirement. (*Id.* at p. 1023.)

Nonetheless, although state action for purposes of California constitutional analysis differed from that of the federal Constitution, turning to the facts before it, *Golden Gateway* found no state action could be found with respect to the complex because the complex was not freely open to the public. (*Golden Gateway Center v. Golden Gateway Tenants Assn. supra,* 26 Cal.4th at p. 1032.) In *Robins,* the court had relied on the fact that shopping centers had become the equivalent of the town squares of old. Shopping centers were open to the public and permitted people to congregate freely, and thus *Robins* concluded that the public character of the property was determinative of the scope of the free speech clause. (*Id.* at p. 1032.) *Golden Gateway* concluded that "the actions of a private property owner constitute state action for purposes of California's free speech clause only if the property is freely and openly accessible to the public." (*Id.* at p. 1033.) Because the apartment complex was privately owned and public access was restricted, no state action existed. (*Id.* at pp. 1033–1034.)

Because public access to the mall at issue is not restricted, we must analyze to what extent Slauson may limit expressive activity on its premises. Cases following the lead of *Robins* have applied it in varying contexts. In *Costco Companies, v. Gallant* (2002) 96 Cal.App.4th 740 [117 Cal.Rptr.2d 344], retailer Costco operated stand-alone stores where it prohibited all expressive activity. At its stores that shared a parking lot with other retail businesses, Costco placed limitations on expressive activity. These limitations

included a prohibition on all expressive activity on the 34 busiest retail days of the year and that expressive activity could not be conducted for more than five days during any 30-day period. Only three participants could be on the premises at any one time, and the premises could not be used on weekends. (*Id.* at pp. 743–744.) The defendants used Costco locations to collect signatures on referenda and petitions and to register voters. They preferred Costco stores because the stores only had one entrance and exit, and such stores are more productive for signature gathering than stores with multiple avenues for ingress and egress. (*Id.* at p. 744.) After there were difficulties enforcing these regulations, Costco commenced an action for injunctive and declaratory relief against the defendants, and the defendants cross-claimed, seeking a judgment invalidating Costco's regulations. (*Id.* at p. 744.)

Costco presented extensive evidence of the costs imposed upon it by the defendants. Furthermore, there was evidence of numerous customer complaints that because the customers were paying a fee to be a member of Costco, they felt they did not have to be subjected to people who were petitioning. Costco received complaints from some customers that the petition gatherers were following them into the parking lot, would not take "no" for an answer, and would continue to pursue the customers. (*Costco Companies v. Gallant, supra,* 96 Cal.App.4th at pp. 750–751.) Costco employees were verbally and physically abused by petition gatherers when they asked the petition gatherers to obey the regulations. There was a concern about escalation in behavior, as people were driving by with automatic rifles pointed at the petitioners. Some of the petitioners expected that Costco was obligated to provide them with protection. Competing groups of petition gatherers would argue with each other. (*Id.* at pp. 751–752.)

The court found this evidence established interference with Costco's business operations and potential liability claims from customers, employees, and the petition gatherers. (*Costco Companies v. Gallant, supra,* 96 Cal.App.4th at p. 753.) Costco's regulations were a reasonable attempt to accommodate the petitioners' free speech rights and its interests in running its business smoothly and profitably. The busiest days of the year rule was a narrowly tailed attempt to preserve ingress and egress on those days when Costco was busiest. The five days out of 30 rule was an attempt to avoid monopolization of the store site by particular groups. (*Id.* at pp. 753–754.) The court also upheld the prohibition on all activity at stand-alone stores. Because the public was invited to Costco solely for the purpose of purchasing goods, rather than to dine or congregate, expressive activity could be prohibited consistent with *Robins.* The customers of a Costco stand-alone store had no ability to avoid petition gatherers, thus placing Costco at risk of being identified with the petition gatherers' causes. (*Id.* at p. 755.)

In *Trader Joe's Co. v. Progressive Campaigns, Inc., supra*, 73 Cal.App.4th 425, Trader Joe's obtained an injunction to halt petitioning activity outside its store in Santa Rosa. The store was a "free-standing modest retail store and parking lot," and defendants, who were seeking signatures on initiative petitions, blocked ingress and egress to and from the store, and harassed and intimidated patrons and employees of Trader Joe's. (*Id.* at p. 427.) Trader Joe's sought to distinguish itself from the regional shopping center in *Robins* on the grounds that its store was not part of a shopping center, was a small store, had only one entrance, and a parking lot that only accommodated 68 vehicles. (*Id.* at p. 428.) The defendant petitioners argued that *Robins* applied to permit their activity because Trader Joe's was not an individual residence or modest retail establishment. (*Id.* at p. 429.)

*Robins* instructed that courts apply a balancing test to the analysis, rather than a bright-line rule, and requires courts to "balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity." (*Trader Joe's Co. v. Progressive Campaigns, Inc., supra*, 73 Cal.App.4th at p. 433.) However, although Trader Joe's opened its store the public, the invitation was more limited than the shopping center in *Robins*. Trader Joe's invited people to come and shop for food and food-related items; it did not invite them to meet friends, eat, rest or be entertained. Thus, "Trader Joe's interest in maintaining exclusive control over its private property is stronger than the interest of a shopping mall owner." (*Ibid.*) Trader Joe's was a single-structure, single-use store. It did not contain plazas, walkways, or a central courtyard where patrons could congregate. In contrast to the shopping center in *Robins,* Trader Joe's was not a public forum uniquely suitable as a place to exercise free speech and petitioning rights, and did not have a public character. (*Id.* at pp. 433–434.) Thus, free speech activity could be banned. (*Id.* at p. 438.)

*Lam v. Ngo, supra*, 91 Cal.App.4th 832, involved a video store in Westminster which placed a North Vietnamese communist flag and a poster of Ho Chi Minh in its window. Large numbers of Orange County's Vietnamese community were outraged and demonstrated at the store. They demanded the support of local politicians, including Garden Grove City Council Member Tom Lam. Lam, however, on the advice of his attorney "kept mum" about the dispute. (*Id.* at p. 837.) Because of his silence, the protestors focused their wrath on Lam, and began to picket his restaurant to demand that Lam resign his city council post. The landlord Ngo, sympathetic to the protestors, allowed them to gather in the parking lot. Lam filed a complaint naming Ngo as the single defendant and obtained a restraining order prohibiting the protestors from approaching within 20 feet of the entrance and windows of the restaurant and from using bullhorns. Later, a modified restraining order established a 50-foot buffer zone in all directions from the perimeter around

the parking lot. Lam sought an injunction based upon declarations establishing that prior to the issuance of the temporary restraining orders (TRO's), protestors physically accosted prospective patrons and shouted epithets at them; slashed tires and pounded on the cars of patrons; used bullhorns to disrupt the meals of those customers who did manage to make it into the restaurant; plastered posters and banners on the side of the restaurant; urinated on the side of the restaurant; an 89-year-old man was surrounded by 30 or 40 protestors who pounded on his car causing $250 in damage; and some of the protestors attempted to videotape or otherwise record the license numbers of patrons.[8] (*Id.* at p. 838.) The restaurant suffered a 40 percent drop in business. The trial court granted an injunction requiring the protestors to stay 900 feet away from the restaurant. (*Id.* at p. 839.)

The protestors filed a motion to strike. Lam opposed the motion using the same evidence used to support the TRO and injunction. (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 845.) With respect to Ngo, the sole named defendant, the court found that the injunction/TRO evidence did not support Lam's opposition to the SLAPP motion because of a lack of evidence that Ngo authorized, directed or ratified the specific unprotected tort activity. The record contained evidence that Ngo had approached a police officer on the first day of the protest, identified himself as the organizer of the protest, and assured the officer that he wanted a peaceful protest and that the protestors would limit their activities to the public sidewalk in front of the restaurant. (*Id.* at p. 846.) However, Ngo instructed the protestors not to take a copy of the TRO when one of Lam's daughters attempted to serve it, and at the time Ngo was inside the buffer zone. The next day, Ngo also violated the buffer zone, and when confronted by Lam's daughter, made a rude gesture, took some pictures of her, and screamed in Vietnamese the equivalent of "I will send these pictures to Playboy magazine." (*Ibid.*) None of the other wrongful conduct (slashed tires, posting of banners, intimidation of customers) could be shown to have been ratified, authorized, or directed by Ngo, and thus he was not liable in tort. (*Ibid.*) However, *Lam* did conclude that the conduct of the unnamed Doe defendants who participated in violence was *not* protected, and gave Lam leave to amend to substitute the names of the Doe defendants.[9]

---

[8] The protestors did not stop there. They also "carried drawings of Lam as a horned and fanged devil with blood dropping down his mouth. They crafted a life-sized effigy of Lam tied to a gallows next to a life-sized effigy of Ho Chi Minh; a bloody axe bearing a South Vietnamese flag, coffin-like box, and the slogan 'Down with the Communists' adorned their creation. The protestors also created three-dimensional effigies of Lam and Ho Chi Minh in lewd sexual positions across the street from the restaurant." (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 838.)

[9] *Lam* also concluded specifically that there could be no tort liability for interference with economic advantage or intentional infliction of emotional distress on grounds not relevant to the instant case. (*Lam v. Ngo, supra,* 91 Cal.App.4th at pp. 847–849.)

In the instant case, our analysis starts with the fact that because the Mall is private property, Slauson did have the right to exclude persons from entering the Mall, and persons who entered the property without its permission were trespassing.[10] (See, e.g., *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244, 1252 [121 Cal.Rptr.2d 810] [essence of trespass is unauthorized entry onto land of another].) However, under the principles set forth in *Robins*, the Mall's right to assert its property rights was not absolute, and our inquiry does not end there. A balancing test is required to evaluate the Mall owners' property rights against the protestors' free speech rights. Lastly, we must consider whether free speech rights, when expressed in a manner that is not peaceful and unobtrusive to the property owner, may nonetheless be permitted on property that is open to the public. To resolve these issues, we must analyze the nature of the speech and the property in question.

With respect to the scope of speech rights, in the instant case, Slauson argues that *Trader Joe's* controls, while Ochoa contends that *Lam* is the relevant authority. Ochoa's argument based upon *Lam* centers on the fact that the speech in question was related to the site, i.e., protestors were protesting Lam's failure to take a stand on the flag-display question. Depriving Ochoa and the protestors access to the Mall would also deprive him of the most effective place for the protestors' picketing, i.e., right in front of the Club. Furthermore, in *Lam,* the sole named defendant, Ngo, did not engage in most of the allegedly wrongful conduct. Here, Ochoa contends he did not ratify, authorize or direct the wrongful conduct of the other protestors. On the other hand, Slauson relies on *Trader Joe's* because in that case, the property owner was permitted to exclude all expressive activity based upon the protestors' less-than-peaceable conduct and the nature of the store as a stand-alone site.

Ochoa's argument ignores the fact that the Mall, although a shopping center containing many stores, is a small property with limited access, much like the stores in *Costco* and *Trader Joe's*, and generally invites the public only for the purpose of purchasing goods. Yet unlike *Costco* and *Trader Joe's*, there is more than one store at the site and the stores share parking; the Club is a place where patrons congregate, but because the Club's entertainment is

---

[10] The protestors' actions also constituted a nuisance, among other possible torts suggested by the facts. (See, e.g., *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 341–342 [23 Cal.Rptr.2d 377] [private nuisance is "anything which is . . . an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property"].) Because all of the cases discussing the issue of free speech at privately owned shopping centers necessarily implicate the private property rights of exclusive possession and ability to exclude access, Ochoa's arguments in this regard are superfluous, although technically well taken. (See, e.g., *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 618 [129 Cal.Rptr.2d 546].) Hence, we do not address them at length; indeed, with respect to any technical defects in the complaint, they are beyond the scope of this appeal.

more like theatre and is generally not as open to the public (it admits only those persons over 18 and has hours that are different from the other stores), it is more like a stand-alone store than a store within a mall. Furthermore, although the Club is the target of the protests, as was the store in *Lam*, that fact alone does not resolve the issue where the protestors are less than peaceable. Indeed, the tortious conduct of the protestors in the instant case is strikingly similar to that of the protestors in *Lam*. Thus, speech could be restricted on the Mall property consistent with *Robins*, but given the fact that more than one store was in the Mall, the protestors could not be completely barred from the site.

The original stipulated injunction was an admirable accommodation in this case, giving the protestors sufficient access to the Mall given its multi-store layout, yet taking into account the Mall's small size and limited purposes (mainly shopping). Unfortunately, Ochoa and the other protestors abused the generous access they had been given. There is no free speech right to yell on bullhorns in an admittedly residential area at 12:30 in the morning, to accost and harass patrons of the Mall, and to deface property. Furthermore, any contention that Ochoa resembles the defendant in *Lam* in that he did not direct the wrongdoing and did not engage in any himself is unsupported by the facts. Ochoa admitted that he directed the protestors; he kept a list of many of their names; and he negotiated the original stipulated injunction, purportedly on their behalf. Furthermore, there is ample evidence of wrongful conduct on his part; for example, his use of a bullhorn.

We also reject Ochoa's contention that the evidence[11] on the preliminary injunction does not support the denial of the motion to strike, or that the trial court failed to consider the competing interests at stake because the injunction was stipulated. Given the trial court's exhaustive statement of decision, which analyzed the relevant cases in great detail, weighed the parties' rights, and evaluated their conduct, we do not understand how Ochoa can claim that the court did not engage in the proper evaluations required under section 425.16 or *Robins*. Indeed, Ochoa did not challenge the stipulation in court when he had an opportunity, instead enjoying generous access to the property. As noted by the court at the hearing to modify the injunction, if Ochoa and the other protestors had abided by the terms of the injunction, no one would be in court. ■ Furthermore, because the evidence in the instant case on the injunction was directly relevant to the motion to strike and did not present the factual problems of *Lam* (weak evidence of individual liability on the part of the named defendant), we find no error in considering the same evidence for both the motion to strike and the injunction.

[11] Because Ochoa's evidentiary objections are deemed waived (see fn. 4, *ante*), we consider all of the evidence presented before the trial court.

## DISPOSITION

The order of the superior court is affirmed. Respondents are to recover their costs on appeal.

Johnson, Acting P. J. and Woods, J., concurred.

A petition for a rehearing was denied November 7, 2003, and on October 29, 2003, and November 6, 2003, the opinion was modified to read as printed above.