[No. A103597. First Dist., Div. Two. Feb. 4, 2005.]

RICHARD E. THOMAS, Plaintiff and Respondent, v.
JOHN QUINTERO, Defendant and Appellant.

636

COUNSEL

Mark Goldowitz, Robins Yeamans and Richard Phelps for Defendant and Appellant.

William L. Dunbar for Plaintiff and Respondent.

**OPINION**

**RUVOLO, J.—**

### I.

#### INTRODUCTION

Appellant John Quintero (Quintero) appeals from the denial of his special motion to strike, brought under California's anti-SLAPP statute (Code Civ. Proc., § 425.16),[1] in response to respondent Richard E. Thomas's (Thomas) petition seeking injunctive relief against civil harassment (§ 527.6). The conduct sought to be enjoined was demonstrating and leafleting by Quintero and others against Thomas's alleged practices as a landlord of multiple rental units.

---

[1] All further statutory references are to the California Code of Civil Procedure unless otherwise indicated.

■ We reverse, holding that anti-SLAPP motions may be filed challenging petitions for injunctive relief brought under section 527.6, because they constitute "causes of action" under the anti-SLAPP law, and there is nothing in section 425.16 which would exempt such petitions from the broad reach of this remedial statute. However, the anti-SLAPP statute does not apply to a proceeding under section 527.6, subdivision (c), which is limited to determining whether an interim temporary restraining order (TRO) should be issued as a prelude to a hearing on the petition for injunctive relief.

We also conclude that Quintero satisfied his threshold burden of proving that the petition for a civil harassment injunction arose out of public conduct "in connection with an issue of public interest," and was, thus, protected activity (prong one) under the anti-SLAPP statute (§ 425.16, subd. (e)(3)). Lastly, we determine that there was no likelihood Thomas would prevail on the merits of his petition (prong two) (§ 425.16, subd. (b)(1)). Accordingly, the anti-SLAPP motion should have been granted.[2] We remand to allow the trial court to make an appropriate award of attorney fees under section 425.16, subdivision (c).

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

On May 9, 2003,[3] Thomas filed a petition for injunction prohibiting harassment against Quintero pursuant to section 527.6. The petition was filed on Form CH-100, a form adopted for mandatory use by the Judicial Council of California (Judicial Council) in response to section 527.6, subdivision (m) requiring it to do so.[4] On the face of the petition, Thomas checked a box indicating that the petition was being accompanied by an application for a TRO.

The petition alleged that Quintero was among a group of people who appeared at Thomas's church, and who then harassed members of the congregation "with the stated purpose of causing extreme embarrassment and severe emotional distress to [Thomas]." The petition went on to explain that

---

[2] While the case was pending on appeal, Thomas filed a motion to dismiss the appeal on the grounds that the appeal was moot, meritless and frivolous. We issued an order on March 16, 2004, stating that the motion would be considered with the issues on the appeal. For the reasons stated in this opinion, the motion to dismiss is denied.

[3] Unless otherwise stated, all of the events described in this opinion took place in 2003.

[4] "(m) The Judicial Council shall promulgate forms and instructions therefor, and rules for service of process, scheduling of hearings, and any other matters required by this section. The petition and response forms shall be simple and concise, and their use by parties in actions brought pursuant to this section shall be mandatory." (§ 527.6, subd. (m).)

good cause existed to include members of Thomas's family within the protection of the orders requested because Quintero and others had also demonstrated at Thomas's home, and threatened to harass his family, thereby placing them "in fear of their security at home." It was noted that Quintero had indicated an intention to return to Thomas's church and home, with the effect of disrupting church activities and invading Thomas's free exercise of religion and right to privacy. The petition was accompanied by declarations signed by Thomas, Charles Cryer, and Sue Louie, the latter two being members of Thomas's church who witnessed the events described in the petition.

At an ex parte hearing on May 9, Alameda County Superior Court Judge Julie M. Conger issued an order to show cause (OSC) using Judicial Council Form CH-120, and set a hearing for June 6 to determine if an injunction should issue as prayed for in the petition. In the meantime, the court granted a TRO which ordered Quintero not to "contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, send any message to, follow, stalk, destroy the personal property of, disturb the peace of, keep under surveillance, or block movements in public places or thoroughfares of [Thomas and his family]." Quintero was also ordered, on an interim basis, to stay at least 100 yards away from Thomas, his family members, and the pastor and members of Thomas's church. Lastly, again on an interim basis, Quintero was prohibited from "distributing false and misleading handbills on private property without permit and in violation of local ordinances, referring to [Thomas] or any other person protected under this order."

The parties appeared before Judge Conger on June 6, at which time Quintero requested a continuance of the hearing on the OSC.[5] The request was granted, and the hearing was continued to July 25. The court ordered that the TRO remain in effect until then.

Ten days later, on June 16, Quintero filed a special motion to strike under the anti-SLAPP statute (§ 425.16), setting the hearing for July 15 in the regular law and motion department of the Alameda County Superior Court before Judge James A. Richman. The motion was accompanied by Quintero's declaration (with exhibits), and a supporting brief. Thomas filed an opposing brief with his own declaration on July 3, and a reply brief was filed by Quintero on July 10, along with certain evidentiary objections to Thomas's declaration. A hearing on the special motion to strike was held on July 15, and Judge Richman denied Quintero's motion.

---

[5] The record does not include a transcript of this hearing. Further, the record does not explain the basis for the requested continuance, although the suggestion was made by Quintero's counsel that the continuance was to allow Quintero and another defendant (who was later dismissed) time to hire counsel.

Thereafter, Thomas's OSC came on for hearing before Judge Conger on July 25, at which time the judge heard testimony from the parties and found that the incidents alleged in the petition did not "rise to the level necessitating a three year civil harassment restraining order." It is also noted in the court's minute order that Quintero agreed not to have further contact with Thomas's pastor, and the matter was dismissed.[6] This appeal challenges *only* the denial of Quintero's special motion to strike by Judge Richman.

## III.

### LEGAL DISCUSSION

### A. The Anti-SLAPP Statute and the Standard of Review on Appeal

Section 425.16, commonly referred to as the anti-SLAPP law, provides in relevant part: "(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly. [¶] (b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination. [¶] . . . [¶] (e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by

---

[6] The record does not contain a transcript of this hearing, and Judge Conger's minute order appears only as an exhibit to Thomas's brief on appeal.

a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

■ Under the statute, the court makes a two-step determination: "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)' [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16, subd. (b)(1) . . . .)" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703]; see also *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon Enterprises*); *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

■ A ruling on a special motion to strike under section 425.16 is reviewed de novo. (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 907 [84 Cal.Rptr.2d 303].) This includes whether the anti-SLAPP statute applies to the challenged claim. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892 [120 Cal.Rptr.2d 576].) Furthermore, we apply our independent judgment to determine whether Thomas's causes of action arose from acts by Quintero in furtherance of Quintero's right of petition or free speech in connection with a public issue. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 721 [77 Cal.Rptr.2d 1], disapproved on another ground in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Assuming these two conditions are satisfied, we must then independently determine, from our review of the record as a whole, whether Thomas has established a reasonable probability that he would prevail on his claims. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 653 [49 Cal. Rptr. 2d 620], overruled on other grounds in *Equilon Enterprises, supra*, 29 Cal.4th at p. 68, fn. 5.)

## B. Section 527.6 Civil Harassment Petitions Are Subject to Special Motions to Strike

At the hearing on Quintero's special motion to strike, the trial court expressed paramount concern for the "fundamental issue" of whether the anti-SLAPP statute applies to section 527.6 proceedings. The judge expressed his belief that it did not, because: (1) a petition under section 527.6 was not a "cause of action" as defined in the anti-SLAPP statute, and (2) applying the anti-SLAPP statute to civil harassment proceedings would be antithetical to the "quick-acting procedure" envisioned by the Legislature's enactment of section 527.6. Also, the court was concerned that the provisions allowing for discovery in connection with a special motion to strike was "counter-intuitive or counter [to] the whole purpose of 527.6." We address these issues in turn.

■ As noted above, the anti-SLAPP statute allows for a special motion to strike to be filed against any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) What constitutes a "cause of action" is not further defined by statute. However, elsewhere in the anti-SLAPP statute the phrase is used interchangeably with the nouns "claim" (§ 425.16, subd. (b)(3)), "complaint" (§ 425.16, subd. (f)), "action" (§ 425.16, subd. (c)), and the phrase "the facts upon which the liability or defense is based" (§ 425.16, subd. (b)(2)). The statute also defines "complaint" to include "cross-complaint" and, importantly here, "petition" (§ 425.16, subd. (h)).

■ Until today, no court has decided the precise question of whether a petition filed for injunctive relief under California's civil harassment statute is subject to a special motion to strike under the anti-SLAPP statute. However, facially the anti-SLAPP statute applies to "petitions" and no exception is made for one filed under the civil harassment statute (§ 527.6). Indeed, the anti-SLAPP statute expressly exempts some forms of legal proceedings from the scope of the statute (§ 425.16, subd. (d)), leading us to that old saw of statutory construction, *"expressio unius est exclusio alterius."* ■ "Under the maxim of statutory construction, *expressio unius est exclusio alterius,* if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.]" (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230 [32 Cal.Rptr.2d 19, 876 P.2d 505], original italics; see also *People v. Oates* (2004) 32 Cal.4th 1048 [12 Cal.Rptr.3d 325, 88 P.3d 56].)[7]

---

[7] We note as well the fact that just last year the Legislature modified the anti-SLAPP scheme by excluding from it additional enumerated causes of action. (See § 425.17.) Proceedings under section 527.6 are not excluded by this new section either.

Furthermore, while not directly deciding this question, in other contexts several courts have treated section 527.6 petitions as causes of action, actions, or lawsuits. For example, in *Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612 [225 Cal.Rptr. 651], one issue on appeal was whether there existed substantial evidence justifying a civil harassment petition under section 527.6, where there was no transcript of the proceedings below. The court characterized the petition for civil harassment as a "cause of action": "[T]he injunction was properly issued in favor of Ms. Doering because the record reflects that the petition was amended on the day of the hearing to allege a *cause of action* for personal harassment against her." (180 Cal.App.3d at p. 614, italics added.)

Likewise in *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719 [255 Cal.Rptr. 453], the court characterized a section 527.6 petition as a lawsuit. The principal issue in that case was to what extent the court could limit the parties' presentation of oral testimony at the hearing on a section 527.6 petition. (207 Cal.App.3d at p. 729.) The court determined that the exclusion of all oral evidence violated the parties' rights to due process.[8] In so deciding, the court referred to the procedure to adjudicate a petition under section 527.6 as "in effect a highly expedited *lawsuit* on the issue of harassment." (207 Cal.App.3d at p. 732, italics added.) As partial support for its view, the court cited to a Judicial Council publication that provided "instructions for litigants in harassment *actions*," which cautions that if a defendant wishes to defend against "the lawsuit," the defendant and his or her witnesses must attend the hearing on the petition. (*Id.* at p. 732, fn. 5.)

These characterizations also clearly and unambiguously bring section 527.6 petitions within the embrace of the anti-SLAPP statute with the same force and effect as those SLAPP cases involving claims for injunctive relief but which were brought under more general procedural statutes. (*Equilon Enterprises, supra,* 29 Cal.4th 53; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449 [125 Cal.Rptr.2d 534]; *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174 [118 Cal.Rptr.2d 330]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993 [113 Cal.Rptr.2d 625].)

Nevertheless, Thomas argues that applying the anti-SLAPP statute to a section 527.6 petition is inimical to the latter's purpose. The trial court observed that section 527.6 is designed to adjudicate claims of harassment involving allegations of potentially serious risk of injury or harm in an

---

[8] In deciding the exclusion of witness testimony violated the defendant's right of due process, the court distinguished the hearing on the merits of a petition from the TRO relief afforded by the statute, a point we address below.

expedited fashion, normally lasting no more than 22 days from start to finish. The trial judge was particularly troubled by the possibility that the anti-SLAPP special motion procedure might be used to "abate" the TRO mechanism, and inhibit resort to the civil harassment statute because of concern for liability for attorney fees, and by the potential complications resulting from even limited discovery in the anti-SLAPP context. (*Schroeder v. Irvine City Council, supra,* 97 Cal.App.4th 174.) The trial judge concluded that the Legislature could not have intended the scope of the special motion to strike to extend to civil harassment petitions under section 527.6. Echoing the trial court's comment, Thomas contends the unique "quick-acting procedure" afforded by the civil harassment remedy would be irreparably undermined if the special motion to strike procedure of the anti-SLAPP law were superimposed on it.

We are fully cognizant that the civil harassment statute establishes a special procedure specifically designed to provide for expedited injunctive relief to persons who have suffered civil harassment. (*Byers v. Cathcart* (1997) 57 Cal.App.4th 805, 811 [67 Cal.Rptr.2d 398].) For purposes of the statutory remedy, "harassment" is defined as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b).)[9] Moreover, the conduct must by its nature be such as to cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff to be enjoined. (§ 527.6, subd. (b).) The statute enjoins for up to three years persons who make threats of a serious nature which, even if not carried out, cause objectively justified substantial emotional distress to another.

Because of the significant social and community value the civil harassment statute provides, like the trial court, we are wary of the potential for conflict between the anti-SLAPP statute and the civil harassment remedy. However, we cannot ignore the relatively straightforward textual solution to the issue of section 527.6's interpretation raised on appeal. Fortunately, we also do not share the concerns expressed that allowing a petition for civil harassment to be attacked by a special motion to strike will interfere with the civil

---

[9] "Unlawful violence" is defined as "any assault or battery, or stalking . . . , but shall not include lawful acts of self-defense or defense of others." (§ 527.6, subd. (b)(1).) "Credible threat of violence" is a "knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).) The statute also requires that the harassment involve a "course of conduct," meaning "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose." (§ 527.6, subd. (b)(3); see *Leydon v. Alexander* (1989) 212 Cal.App.3d 1 [260 Cal.Rptr. 253].)

harassment statutory scheme, nor do we view it as being likely to inhibit the invocation of that procedure.

First, we see no reason that the special motion to strike procedure will interrupt the time line established for determining a civil harassment petition's merits. If a TRO has been granted, a hearing on the petition must be held within 15 days or, if good cause appears, 22 days from the date the TRO is issued. (§ 527.6, subd. (d); Cal. Rules of Court, rule 363(a).) If a TRO is issued without notice, the defendant is entitled to one continuance for a reasonable period of at least 15 days or any shorter period the defendant requests, to enable the defendant to meet the plaintiff's application. (§ 527, subd. (d)(4); *Adler v. Vaicius* (1993) 21 Cal App.4th 1770, 1775–1776 [27 Cal.Rptr.2d 32].) The TRO remains in effect until the date of the continued hearing. (§ 527, subd. (d)(4).) Additionally, the court retains the power to modify or terminate the TRO. (§ 527.6, subd. (c).)

But, despite the short time line specified in the statute for a hearing on the merits of a petition (nominally 22 days from the date a TRO is granted ex parte), that time can be extended by a request for a continuance unrelated to a defendant's desire to challenge the petition via a special motion to strike under the anti-SLAPP statute. If such a request is made by the defendant, the time from the issuance to the TRO to a hearing on the·petition will be extended at least to 37 days. It can be longer. In this case, the hearing was not held until July 25, a total of 75 days from the issuance of the TRO, while the TRO remained in effect.

Regardless of whether the hearing on a civil harassment petition takes place 22 or 75 days after filing, even if a defendant's response to the petition includes the filing of a special motion to strike, we see no reason that the pendency of that motion should interfere with the disposition of a section 527.6 petition. Neither the court below nor Thomas has suggested how any interference could manifest itself. Indeed, in this case the special motion came on for hearing *before* the hearing on Thomas's petition, and there is no indication that the section 527.6 proceeding was prejudiced by the filing of the special motion to strike. Surely, any threat to the efficacy of the civil harassment proceeding, should it arise, can be eliminated by the trial court's use of well-known case management tools.[10]

---

[10] We note that the California Supreme Court has pending before it the question of whether an appeal of the denial of a special motion to strike under section 425.16 automatically stays the trial court proceedings, pursuant to section 916. (*Varian Medical Systems, Inc. v. Delfino*, review granted Mar. 3, 2004, S121400; see also *Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1189–1190 [121 Cal.Rptr.2d 794].) Regardless of how that issue is decided by our high court, it would not affect a trial court's *prohibitory* civil

■ Similarly, we have no concern that a request for discovery under the anti-SLAPP law might interfere with a hearing on a civil harassment petition.[11] The anti-SLAPP statute itself imposes a general stay on discovery in the "action," subject to a motion upon a showing of good cause. (§ 425.16, subd. (g).) Thus, the norm would have both the hearings on the petition and the special motion to strike proceed without discovery.

To be sure, despite the general stay on discovery once a special motion to strike is filed, " 'on noticed motion and for good cause shown, [the court] may order that specified discovery be conducted notwithstanding this subdivision.' " (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 867 [44 Cal.Rptr.2d 46].) If necessary, "while the statute says the motion to strike 'shall be noticed for hearing not more than 30 days after service' [citation], nothing therein prevents the court from continuing the hearing [on the special motion to strike] to a later date so that the discovery it authorized can be completed where a reasonable exercise of judicial discretion dictates the necessity therefor." (*Id.* at p. 868, italics omitted; see also *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347 [42 Cal.Rptr.2d 464].) But even if a request is made for discovery in connection with a pending special motion to strike, there is no reason to delay the hearing on a civil harassment petition. Moreover, the trial court could order that discovery in connection with a pending special motion to strike take place only after the hearing on the civil harassment petition. To do otherwise could arguably be an abuse of discretion if a trial court allowed discovery to go forward at a time, or in a manner, which interfered in any way with the prompt hearing on a petition under section 527.6.

We consider the argument that special motions to strike will inhibit the pursuit of civil harassment injunctions to be dubious. A person driven by the need to seek the exigent protection of the legal system in the face of serious threats of harm or violence will not be deterred by the potentiality of collateral litigation. In any case, that potentiality exists already. The statute itself allows a respondent to respond by filing a cross-complaint (§ 527.6,

---

harassment TRO or preliminary injunction issued under section 527.6. (*Agricultural Labor Relations Bd. v. Superior Court* (1983) 149 Cal.App.3d 709, 716–717 [196 Cal.Rptr. 920].)

[11] There is no provision under section 527.6 allowing for discovery, and in any case, under the civil harassment scheme there is insufficient time in which to conduct discovery. (See generally *Byers v. Cathcart, supra,* 57 Cal.App.4th at p. 811; *Diamond View Limited v. Herz, supra,* 180 Cal.App.3d 612, 619–620, fn. 8.) Section 527.6, subdivision (d) requires the trial court to "receive any testimony that is relevant" at the hearing. The court in *Schraer* commented in a footnote that this could be in the form of oral or written testimony, including affidavits, declarations or deposition. (*Schraer v. Berkeley Property Owners' Assn., supra,* 207 Cal.App.3d at p. 733, fn. 6.) This statement is mystifying inasmuch as no case holds that discovery is allowed under section 527.6, and the general testimonial statute allowing for testimony in the form of affidavits, deposition, or oral testimony was earlier found by the *Schraer* court to be inapplicable to section 527.6 proceedings. (*Berkeley Property Owners' Assn.,* at p. 731.)

subd. (d); *Kobey v. Morton* (1991) 228 Cal.App.3d 1055, 1059 [278 Cal.Rptr. 530].) Also, suits between the parties for such common law torts as invasion of privacy and intentional infliction of emotional distress are not foreclosed by the civil harassment procedure. (*Grant v. Clampitt* (1997) 56 Cal.App.4th 586 [65 Cal.Rptr.2d 727].) The related question of whether a suit for malicious prosecution can be based on the denial of a petition under section 527.6, remains unanswered. Certainly too, a respondent can pursue an appeal if the petition is granted. (*Kobey v. Morton, supra,* 228 Cal.App.3d 1055; *Schild v. Rubin* (1991) 232 Cal.App.3d 755 [283 Cal.Rptr. 533].) With all of these collateral proceedings, which can result from a civil harassment dispute, the possibility that a plaintiff might also have to oppose a special motion to strike seems to us to add little disincentive to invocation of the civil harassment remedy. If the future proves us ultimately to be wrong on this point, the Legislature can amend the anti-SLAPP statute, as it has done before, eliminating petitions under section 527.6 from the reach of that law. Until then, we are required to determine the meaning of a statute *as written*, and not to supply a meaning which ignores the text.

By the same token, we disagree that worthy harassment claims will be curtailed because of the prospect that the plaintiff may be required to pay the defendant's costs and attorney fees if a special motion to strike is granted. First, anecdotally, although section 527.6 allows for legal representation, it is well known that, in reality, few people appearing at hearings on civil harassment petitions are represented by counsel. (§ 527.6, subd. (e).) That the civil harassment proceedings are most often litigated in propria persona can also be inferred from the Judicial Council's apparent need to provide detailed instructions to litigants about the civil harassment procedure, all written in plain language for the layperson.

To the extent counsel are involved, the risk of incurring liability for attorney fees and costs already exists under the civil harassment statute, if the respondent prevails on the petition (§ 527.6, subd. (i); *Byers v. Cathcart, supra,* 57 Cal.App.4th 805.) Moreover, a respondent who brings a frivolous special motion to strike, or one intended solely to cause unnecessary delay, can be assessed the cost of petitioner's attorney fees. (§ 425.16, subd. (c); *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 198–199 [10 Cal.Rptr.3d 154].) Thus, the threat of exposure to SLAPP-related attorney fees seems likely to be of little additional concern to those who feel the need for the judicial system's legal protection in their personal affairs.

Moreover, contrary to Thomas's contention, we do not believe that protecting First Amendment rights by applying the anti-SLAPP statute to a petition for injunctive relief under section 527.6 is inimical to the purposes of

that section. Section 527.6 expressly provides that "[c]onstitutionally pro-tected activity is not included within the meaning of 'course of conduct.'" (§ 527.6, subd. (b)(3); see *Grant v. Clampitt, supra,* 56 Cal.App.4th at p. 591.)

■ For all of these reasons, we hold that petitions brought pursuant to section 527.6 are subject to attack by a special motion to strike under section 425.16.

■ However, we conclude that no motion to strike can be filed in response to the TRO procedure provided for in the civil harassment statute. We emphasize that the purpose of a petition under section 527.6 is to obtain an injunction against wrongful conduct described in the statute. One does not file a petition simply to obtain the temporary, and interim, relief afforded by a TRO. In fact, if a TRO is granted, and the petition is thereafter dismissed without a hearing, the petitioner is not deemed to have prevailed for purposes of recovering costs and attorney fees. (*Adler v. Vaicius, supra,* 21 Cal.App.4th at p. 1775.) Thus, a request for a TRO is simply an "application." It does not qualify as a "cause of action" under the anti-SLAPP statute as it is not a "claim" (§ 425.16, subd. (b)(3)), "complaint" (§ 425.16, subd. (f)), "action" (§ 425.16, subd. (c)), "cross-complaint" or "petition" (§ 425.16, subd. (h)).

■ Nor is the procedure for obtaining a TRO akin to an adjudication of a disputed claim. So informal is the TRO proceeding that it does not even have to afford due process protections to the person against whom the TRO is directed. For example, no notice must be given to the person sought to be restrained before the TRO is issued. The TRO requires only that the applicant show "reasonable proof of harassment," and then only by affidavit.[12] On an ex parte showing of good cause, the court also has the discretion to issue a TRO that includes other named family or household members who reside with the applicant. (§ 527.6, subd. (c).)[13] (*Schraer v. Berkeley Property Owners' Assn., supra,* 207 Cal.App.3d at p. 732; *Adler v. Vaicius, supra,* 21 Cal.App.4th at p. 1775.)

■ Therefore, we conclude that it would be unreasonable to interpret the anti-SLAPP statute's special motion to strike remedy as applying to an

---

[12] By contrast, no injunction can be ordered unless the court finds harassment as defined by the statute (§ 527.6, subd. (b)) has occurred by "clear and convincing evidence." (§ 527.6, subd. (d).)

[13] No filing fee may be charged for a petition that alleges that the respondent has inflicted or threatened violence against the petitioner, stalked the petitioner, or acted or spoken in any other manner that has placed the petitioner in reasonable fear of violence, and that seeks a restraining order or injunction restraining stalking, future violence, or threats of violence. (§ 527.6, subd. (o).)

application for a TRO under section 527.6. We turn, then, to the issue of whether the "cause of action" in the petition "aris[es] from any act of [Quintero] in furtherance of the [Quintero's] right of petition or free speech under the United States or California Constitution in connection with a public issue."

## C. Protected Activity

 A cause of action is subject to a motion to strike under the anti-SLAPP statute even if it is based only in part on allegations regarding protected activity. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 308 [106 Cal.Rptr.2d 906].) However, "it is the principal thrust or gravamen of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies [citation], and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 [6 Cal.Rptr.3d 494].)

 As we quoted earlier in this opinion, section 425.16 applies if the cause of action "arises from" any one of four types of activities, all of which are "protected" by the section: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subds. (e)(1)–(4).)

Quintero contends that Thomas's civil harassment petition complains of activity that he engaged in, which fell under *three* of these four categories— (e)(2), (3) and (4). As we explain, we conclude that the petition directly arises out of activities under subdivision (e)(3). Therefore, our discussion focuses on that subdivision, and we do not decide whether subdivision (e)(2) and (4) are also implicated.

### 1. Quintero's Factual Evidence in Support of Special Motion to Strike

In Thomas's petition, the Judicial Council Form CH-100 asks for a "description of conduct" under which Thomas typed the following:

"On or about Sunday April 27, 2003 [Quintero] was part of a group that appeared at [Thomas's] church, First Presbyterian Church [address].

"[Quintero] was part of a group of persons who harassed church members, blocked entrances, and trespassed on church property, with the stated purpose of causing extreme embarrassment and severe emotional distress to [Thomas]."

In his special motion to strike, Quintero began by recounting his overall relationship with Thomas. Quintero and his son became tenants in a building owned by Thomas in 1998. Thereafter, the parties became embroiled in a number of landlord-tenant disputes, which culminated in an eviction proceeding. A jury found against Quintero following a trial in April 2003, and Quintero had a 60-day stay of his eviction by paying rent through June 18, 2003.

Several months before the trial, Quintero, who was being assisted by the Eviction Defense Center, was put in touch with a group called Campaign for Renters Rights (CRR). Through CRR, Quintero met many other former tenants of Thomas, and learned that Thomas was a "notorious landlord" whose pattern for unjust evictions throughout Oakland was "the first big public case of the campaign in Oakland for a Just Cause for Eviction Ordinance."

Quintero also learned that Thomas was a member of the First Presbyterian Church in Castro Valley, and was a deacon of that congregation. Therefore, in late April 2003, Quintero sent a letter to the pastor of that church entreating him to intercede with Thomas on Quintero's behalf and stop the eviction. The pastor called Quintero in response to the letter, at which time Quintero described his relationship with Thomas, and pointed out "that many other people had been hurt by [Thomas]." The pastor declined to become involved.

On Sunday, April 27, CRR sponsored a demonstration on the public sidewalk and parking lot at the church. Quintero was among the demonstrators, who also distributed a leaflet entitled "Why We Are Flyering Your Church." The leaflet, a copy of which appears as Appendix A to this opinion, stated that CRR has a four-year record of helping tenants, and that it had helped to organize 21 former tenant families who were allegedly owed more

than $35,000 in unpaid security deposits by Thomas. In the course of its work, CRR claims to have contacted more than 100 former tenants of Thomas's. Among other assertions, the leaflet goes on to allege that Thomas had filed evictions against 142 families over a five-year period, that he was successfully sued by the City of San Rafael for $19,000 when he failed to initiate repairs of rental units he owned there, and that he was the "first big public case" of Just Cause Oakland, apparently resulting from his evictions and failure to repair rental units in that city.

Another leaflet, Appendix B to this opinion, was allegedly distributed at the church on or about June 1, 2003. It reiterates many of the allegations contained in the earlier leaflet, but this time, specifically makes reference to Thomas's then-pending civil harassment petition against Quintero. In addition to seeking support for Quintero (the date, time, and department of the OSC is blocked in the middle of the leaflet), the group implores members of the congregation to intercede, asks church elders to meet with CRR representatives, and to "look into the practices of a church official."

### 2. Thomas's Factual Evidence in Opposition to Special Motion to Strike

The only evidence submitted by Thomas in opposition to Quintero's special motion to strike was his own six-paragraph declaration. In his reply brief below, Quintero lodged a number of evidentiary objections to Thomas's declaration. Understandably, the trial court made no rulings on these objections, because, as discussed *ante*, the court's ruling on Quintero's special motion to strike did not proceed so far as to consider whether Quintero's conduct was "in connection with a public issue."

We are mindful that, at least when the motion is one for summary adjudication, our Supreme Court has observed that, for purposes of appeal, the reviewing court may consider the objected to evidence in the absence of a ruling on objections by the trial court. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186–1187, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207].) This general rule has been distinguished in several recent cases. (See *Vineyard Springs Estates, LLC v. Superior Court* (2004) 120 Cal.App.4th 633, 643 [15 Cal.Rptr.3d 587]; *Sambrano v. City of San Diego* (2001) 94 Cal.App.4th 225, 235–238 [114 Cal.Rptr.2d 151]; *City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 784–785 [97 Cal.Rptr.2d 140].)

The above authorities, decided in the context of motions for summary judgment, are inapposite. In those cases, the issue of whether evidentiary objections were waived in the absence of rulings by the trial court occurred in the context of summary adjudications where the lower courts were necessarily required to rule in order to determine if a material issue of fact existed. To the contrary, this case arose in the context of a special motion to strike, and the court disposed of the motion on a legal ground not requiring a consideration of the evidence presented.

We also note that the general waiver rule has been applied in at least one case involving a special motion to strike under section 425.16. (*Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1014, fn. 4 [5 Cal.Rptr.3d 668].) However, in *Slauson Partnership*, the trial court denied the motion, finding that there was a reasonable probability that the plaintiff in that case would prevail on the merits of his claim. This ruling necessarily related to the factual showing of the respective parties, including that evidence to which objections were made. For that reason, like the summary adjudication cases discussed above, this case, too, is inapposite.

Given that our standard of review is de novo, and that the parties have been afforded an opportunity in this court to address Quintero's objections to Thomas's declaration,[14] it would be unnecessary and unfair in the particular procedural context of this case to deem Quintero's objections waived. Additionally, we will not delay justice by remanding the case to the trial court for rulings and further findings, only to find ourselves again reviewing the question of whether Quintero's conduct fell within the protection of the anti-SLAPP statute in a subsequent appeal. Therefore, we rule on the objections which appear in the record as follows: Objections denominated B.1. through B.5. are sustained. Objection A. is overruled. Objections to the June 5, 2003 declaration of Thomas, and to the declarations of Charles Cryer and Sue Louie dated June 4 and 3, respectively, submitted in connection with Thomas's petition for civil harassment injunction, are moot inasmuch as Thomas did not offer these declarations in opposition to the special motion to strike under section 425.16.

---

[14] Although the objections were not addressed by either side in their respective appellate briefs in this court, we did ask the parties, by letter, to address them during oral argument, and an opportunity to do so was afforded counsel.

Thus, in addition to the evidentiary record presented by Quintero in support of the special motion to strike, there was additional admissible evidence offered by Thomas indicating that Thomas was the owner of several apartment buildings in Alameda County. He was also an elder and trustee of the 700-member First Presbyterian Church of Hayward, located in Castro Valley. The pastor of the church received unsolicited and unwanted communications from Quintero requesting that the pastor intervene in Quintero's then-pending eviction from one of Thomas's properties. Quintero was not a member of the church. The pastor supported Thomas in his dispute with appellant, and was unwilling to intervene as requested by Quintero.

### 3. Quintero's Conduct Was Public Conduct in Connection with an Issue of Public Interest

We agree that the weapons of choice in SLAPP suits appear to be claims for "defamation, various business torts such as interference with prospective economic advantage, nuisance and intentional infliction of emotional distress. [Citation.]" (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 816 [33 Cal.Rptr.2d 446], overruled on other grounds in *Equilon Enterprises, supra,* 29 Cal.4th at p. 68, fn. 5; *Gallimore v. State Farm Fire & Casualty Ins. Co.* (2002) 102 Cal.App.4th 1388, 1400 [126 Cal.Rptr.2d 560].) However, resort to the courts' injunctive powers to stifle speaking out on public issues in many instances has served as the reserve arsenal for SLAPP plaintiffs. (*Equilon Enterprises, supra,* 29 Cal.4th 53; *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322 [9 Cal.Rptr.3d 197].)

It is not difficult to stand back from the admissible evidence in this case and conjure such a "paradigm" SLAPP suit arising out of a claim for injunctive relief under section 527.6. After a large number of similar legal disputes with a local landlord, disgruntled former tenants engage in public demonstrations against the landlord at the landlord's church in the hope that they might result in the landlord desisting from the use of allegedly controversial property management practices against tenants. In response, the landlord obtains a TRO and seeks an injunction against at least one of the protesting former tenants, the unabashed purpose of which is to stop the embarrassing protests.

Certainly, the circumstances of this case share salient features with innumerable SLAPP suits of the past: "[W]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so. (Pring, *SLAPPs: Strategic Lawsuits Against Public*

*Participation* (1989) 7 Pace Envtl. L.Rev. 3, 5–6, 9.)" (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 816–817, fn. omitted, overruled on other grounds in *Equilon Enterprises, supra,* 29 Cal.4th at p. 68, fn. 5.)

█ Application of section 425.16, subdivision (e)(3) ("statement . . . made in a place open to the public or a public forum in connection with an issue of public interest") turns on whether the acts of appellant in picketing and leafleting at respondent's church were protected activities. There is no question that the events took place in a "place open to the public," and respondent does not otherwise suggest.

Where the margins are drawn as to what constitutes an "issue of public interest" under section 425.16, subdivision (e)(3) has been one of many subjects of anti-SLAPP jurisprudence which has garnered substantial judicial attention in the last several years. One of these cases is *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122 [2 Cal.Rptr.3d 385], in which the defendant, an avid "token collector," had sent letters to fellow collectors, and published negative comments and advertisements in a token collectors' newsletter (the Talkin' Tokens) about a fellow collector's practices, including allegations of criminal conduct. The collector who was the target of the obloquy sued for defamation and related torts, and one of the issues examined by the court was to what extent these challenged communications concerned an "issue of public interest."

█ In wrestling to find the statutory definition's parameters, the court explained: "The statute does not provide a definition for 'an issue of public interest,' and it is doubtful an all-encompassing definition could be provided. However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest. A few guiding principles may be derived from decisional authorities. First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. (*Dun & Bradstreet v. Greenmoss Builders* [(1985)] 472 U.S. [749,] 762 [86 L.Ed.2d 593, 105 S.Ct. 2939].) Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. (*Ibid.*; *Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135 [61 L.Ed.2d 411, 99 S.Ct. 2675].) Third, there should be some degree of closeness between the challenged statements and the asserted public interest (*Connick v. Myers* (1983) 461 U.S. 138, 148–149 [75 L.Ed.2d 708, 103 S.Ct. 1684]); the assertion of a broad and amorphous public interest is not sufficient (*Hutchinson v. Proxmire, supra,* 443 U.S. at p. 135.) Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for

another round of [private] controversy. . . .' (*Connick v. Myers, supra,* 461 U.S. at p. 148.) Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' (*Hutchinson v. Proxmire, supra,* 443 U.S. at p. 135 . . . ." (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at pp. 1132–1133.)

Applying these considerations to the facts of *Weinberg,* the court concluded there was no issue of public interest involved, because the dispute was essentially a private matter between two collectors, resulting in a campaign by one to discredit the other "in the eyes of a relatively small group of fellow collectors." (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at p. 1135.)[15] In so concluding, the court relied in part on this court's then-recent decision in *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 [130 Cal.Rptr.2d 81], which, like the court in *Weinberg,* surveyed the extant authorities on the question of what constitutes an "issue of public interest." The *Rivero* court concluded that there was no public issue when defendant's conduct consists of distribution of three flyers critical of a work supervisor's treatment of eight subordinate custodians at UC Berkeley's International House. (*Id.* at p. 924.)

Suffice it to say that there are no cases dealing with the precise constellation of facts we confront—former tenant protests against the maintenance and eviction practices of a landlord of multiple dwelling units. However, there are cases arising out of protests generated by intended uses of real property in a local community that are instructive.

In *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] (*Averill*), efforts by a homeowner to protest and prevent a residence in her neighborhood from being converted into a battered women's shelter, including efforts to dissuade her employer from supporting the charitable funding for the conversion, were met with an action by the charitable group claiming defamation and intentional interference with prospective economic advantage. (*Id.* at pp. 1172–1173.) The court reversed a trial court's refusal to grant the homeowner/defendant's special motion to strike, in part,[16] concluding that the defendant's conduct "clearly came within the purview of the [anti-SLAPP] statute" as comment on a "public issue": "Here, the allegedly slanderous statements arose in the context of a public issue, i.e., the placement of a shelter in petitioner's neighborhood. Petitioner was an outspoken

---

[15] The National Token Collectors Association boasts membership of 700, which includes several more local associations, including the Western States Token Society, which has about 50 members. (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at p. 1127.)

[16] The principal issue examined by the court was to what extent private conversations between the homeowner and her employer were protected activities. (*Averill v. Superior Court, supra,* 42 Cal.App.4th at p. 1174.)

critic of the project. She had petitioned the city council, arguing against the project and had written to the local newspaper expressing her concern regarding the project and its director." (*Id.* at p. 1175.)

Relying on *Averill*, the court in *Foothills Townhome Assn. v. Christiansen* (1998) 65 Cal.App.4th 688 [76 Cal.Rptr.2d 516] held that a suit by a homeowners association to recover an unpaid $1,300 assessment needed to replenish the association's capital reserves, brought against a recalcitrant homeowner "involved matters of sufficient public interest made in a sufficiently public forum to invoke the protection of section 425.16." (*Foothills Townhome,* at pp. 695–696.)[17]

Another homeowner-related dispute was at the core of *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 [102 Cal.Rptr.2d 205] (*Damon*). There, the dispute concerned the conduct of the general manager of a planned development residential community of 1,633 homes. Criticism of the manager, as well as calls for his ouster, was made by two members of the association's board of directors in the development's newsletter. The controversy escalated until it had divided the community into those who favored retaining the manager, and those who were opposed to him, and led to several other directors taking sides. It even sparked a recall campaign against the two directors by those supportive of the manager's retention. The dispute resulted in a defamation action by the manager against those opposed to him who had the most sway in the community, and against the newsletter publishers. (*Id.* at pp. 471–473.)

The court concluded that the dispute implicated an "issue of public interest." First, it noted that essentially private conduct can serve to be an issue of public interest where it "impacts a broad segment of society. . . . ' "[M]atters of public interest . . . include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." ' (*Macias v. Hartwell* [1997] 55 Cal.App.4th [669,] 674 [64 Cal.Rptr.2d 222].)" (*Damon, supra,* 85 Cal.App.4th at p. 479.) It then analogized the governance of the planned residential development community involved in that case with public governance, observing that " '[f]or many Californians, the homeowners association functions as a second municipal government . . . .' (*Chantiles v. Lake Forest II Master Homeowners Assn.* [1995] 37 Cal.App.4th [914,] 922 [45 Cal.Rptr.2d 1].)" (*Damon, supra,* 85 Cal.App.4th at p. 479.)

---

[17] Nevertheless, the court affirmed the denial of plaintiff's special motion to strike after concluding that the association's lawsuit was not brought to chill defendant's right of free speech, and there was a likelihood of it prevailing on its claim for arrearage. (*Foothills Townhome Assn. v. Christiansen, supra,* 65 Cal.App.4th at p. 696.)

Given these authorities' expansive interpretation of the phrase "issue of public interest," and in light of the statute's mandate that we construe the law broadly so as to "encourage continued participation in matters of public significance" (§ 425.16, subd. (a)), we conclude that Quintero's activities here were protected under section 425.16, subdivision (e)(3). Quintero did not act alone, but in conjunction with planned demonstrations against Thomas by a nonprofit group purportedly dedicated to upholding tenant rights. Thus, while his private interests were certainly in issue, there were much broader community interests at stake in the protests. For example, Thomas was accused of wrongfully evicting and improperly retaining the security deposits of more than 100 tenants. He was also accused of a pattern of refusing to make needed repairs to his rental properties, allegedly resulting in legal action being taken against him by several municipalities.[18] These are not token concerns, but matters that impact the broader community, certainly no less so than the battered women's shelter at issue in *Averill*, or the fight over a $1,300 assessment in *Foothills Townhome Assn. v. Christiansen, supra*, 65 Cal.App.4th 688. The allegations against Thomas implicate both a concern for the stability of the rental market in the affected community, as well as intimate the threat of potential urban blight associated with the failure to make necessary repairs to buildings in the neighborhood.

We are also impressed by the fact that the protest activities were not an end to themselves, but were coupled with a genuine effort to engage the members of Thomas's congregation in discussing and finding a solution to the disputes—that is, the activity was directed at encouraging participation by the protestors and the church in an "ongoing controversy, dispute or discussion." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 [1 Cal.Rptr.3d 501] (*Du Charme*).) In *Du Charme*, this division rejected a claim that postings on a labor union's Web site disclosing that the union's business manager had been terminated by the union for financial defalcations were protected under section 425.16, subdivision (e)(3). (110 Cal.App.4th at p. 119) The court concluded that the postings did not warrant the protection of the anti-SLAPP statute because they did not seek to encourage public participation in any controversy, debate or discussion, and thus did not involve "an issue of public interest." (*Ibid.*)

Here, there was a direct call for public involvement in an ongoing controversy, dispute or discussion with respect to Thomas's past and continued property management practices. Under *Du Charme*, to the extent the subject of Quintero's protest was a private, and not a public, matter, it

---

[18] We note that none of the matters raised in the flyers distributed by CRR and Quintero were disputed by Thomas in his opposition to Quintero's special motion to strike.

nevertheless was one of widespread public interest occasioned by the sincere attempt to seek public support for, and resolution of, this dispute.[19]

### D. Likelihood of Prevailing on Claim

■ Ordinarily, "[t]he process the court uses in determining the merits of the motion is similar to the process used in approaching summary judgment motions. The evidence presented must be admissible [citation] and the trial court does not weigh the evidence. [Citation.] Rather, a probability of prevailing is established if the plaintiff presents evidence establishing a prima facie case which, if believed by the trier of fact, will result in a judgment for the plaintiff. [Citation.]" (*Mattel, Inc. v. Luce, Forward, Hamilton & Scripps* (2002) 99 Cal.App.4th 1179, 1188 [121 Cal.Rptr.2d 794].)

■ Thomas's ability to prevail on the merits of his civil harassment petition depends upon proof, by clear and convincing evidence, that he was subjected to unlawful harassment as defined by section 527.6, subdivision (b). (§ 527.6, subd. (d); *Schraer v. Berkeley Property Owners' Assn., supra,* 207 Cal.App.3d 719.) He clearly did not meet this standard for several distinct reasons.

First, the evidentiary showing made by Thomas in support of his special motion to strike was woefully inadequate to meet even the minimal standard of proof required by the civil harassment statute. Essentially, he presented evidence, not disputed by Quintero, that he was a landlord of multiple rental units in Alameda County, that Quintero was one of his former tenants whom Thomas had successfully evicted, and who was now engaged in public demonstrations at Thomas's church protesting that action, and who contacted the church's pastor seeking his intervention in the landlord-tenant dispute.

■ However, section 527.6 requires significantly more. The harassment against which an injunction may issue under this statute must be "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to

---

[19] We are aware of the very recent decision by Division One of the Fourth District, *O'Meara v. Palomar-Pomerado Health System* (2005) 125 Cal.App.4th 1324 [23 Cal.Rptr.3d 406], which held, in part, that a physician's suit against a hospital medical peer review committee did not arise out of a "public issue" or involve an "issue of public interest." However, that case is factually distinguishable both because of the limited number of persons interested in the "specific nature" of the issue examined by the peer review committee, and the absence of any claim that the committee's review involved a "public controversy or dispute." (*Id.* at 1336–1337.)

the plaintiff." (§ 527.6, subd. (b).) In the first instance, Thomas presented no evidence that he was a victim, or threatened victim, of violence of any sort.

Nor did Thomas present any evidence that he was the victim of a "knowing and willful course of conduct" that "seriously alarm[ed], annoy[ed], or harasse[d]" him and which "serve[d] no legitimate purpose." (§ 527.6, subd. (b).) Even if Thomas demonstrated that he had been seriously alarmed, annoyed or harassed by Quintero's conduct, there was no showing that Quintero's injurious actions were part of a "course of conduct." In this regard, the statute defines "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, fax, or computer e-mail. *Constitutionally protected activity is not included within the meaning of 'course of conduct.'* " (§ 527.6, subd. (b)(3), italics added.)

Because we have already concluded that Quintero's conduct constituted a form of protected speech, Quintero manifestly cannot meet the section's alternative test. Even if the conduct was not constitutionally protected, Quintero was not engaged qualitatively in a "pattern of conduct" as contemplated by the statute.

Furthermore, we are not required to ignore the fact that Judge Conger dismissed Thomas's petition after a hearing at which both parties testified, and upon a finding that "the incidents do not rise to the level necessitating a three year civil harassment restraining order."[20] This determination is dispositive of the issue of whether there existed a probability that Thomas would prevail on his claim. Indeed, no prognosticating on this issue is necessary. There was no probability that Thomas would prevail on his petition—he lost on its merits. Moreover, no appeal has been taken from that determination rendering it final in all respects.

One of the appellate issues determined in *Slauson Partnership v. Ochoa, supra,* 112 Cal.App.4th 1005, was what effect, if any, would be accorded the fact that the plaintiff obtained a preliminary injunction. Could it be used presumptively by the plaintiff opposing a special motion to strike under section 425.16 to satisfy plaintiff's burden of demonstrating a likelihood of prevailing on the underlying claim? The court concluded that success on the preliminary injunction claim can be used to meet the second prong of a special motion to strike under section 425.16, subdivision (b)(1). (*Slauson*

---

[20] See *ante,* footnotes 4 and 5.

*Partnership,* at p. 1022; accord, *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 354–357 [125 Cal.Rptr.2d 383].)

But in *Lam v. Ngo* (2001) 91 Cal.App.4th 832 [111 Cal.Rptr.2d 582], the presence of other causes of action, and the possibility that the trial court may have granted injunctive relief for reasons other than the merits, led the *Lam* court to conclude that the granting of injunctive relief was not dispositive as to the "likelihood [of prevailing] . . ." prong of a special motion to strike. (*Id.* at pp. 843–844.) In this regard, the court noted that in ordinary cases involving claims for preliminary injunctive relief, the court must balance equities in assessing whether to grant the injunction, whereas an assessment under a special motion to strike as to the likelihood a plaintiff will prevail confronts the court with "a much more binary task." (*Id.* at p. 843.) Therefore, the tests involve different standards preventing an order granting a preliminary injunction from being used to preclude a defendant bringing a special motion to strike from arguing the absence of a likelihood of prevailing on the merits. (*Ibid.*)

We agree that the *denial* of a general claim for a preliminary injunction can be for reasons other than a finding the petition lacks merit, and that in such cases, the denial of that relief should not have preclusive effect. However, we do not share the *Lam* court's view that the *granting* of injunctive relief can be viewed as anything other than a judicial finding that the petitioner has proved a likelihood of prevailing on the claim, a prerequisite for injunctive relief. (See *White v. Davis* (2003) 30 Cal.4th 528, 554 [133 Cal.Rptr.2d 648, 68 P.3d 74]; *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1470 [28 Cal.Rptr.2d 734].)

 In any case, the granting or denial of a civil harassment petition brought under section 527.6 involves no balancing. The sole issue is whether there is clear and convincing evidence that harassment, as defined by the statute, has occurred. (§ 527.6, subd. (d).) The fact that the trial court in this case determined after a hearing that civil harassment did not take place necessitating an injunction can serve as nothing less than a judicial determination that there was no probability Thomas would prevail.[21]

---

[21] As we have pointed out, the fact that Thomas obtained a TRO is of no consequence to this issue, because his "cause of action" was for injunctive relief, not for a TRO. Additionally, the TRO procedure, including the fact that it was, and typically is, issued ex parte, lacks due process protections. Therefore, granting of a TRO does not reflect on the merits of the underlying dispute, and does not qualify the enjoining party to "prevailing party" status. (*Adler v. Vaicius, supra,* 21 Cal.App.4th at p. 1775.)

Although the trial court's finding against Thomas on the merits of his petition conclusively resolves the second prong analysis associated with his special motion to strike, we can conceive of a factual case where the denial of a civil harassment injunction should not preclude a finding that the petitioner under section 527.6 had a probability of success on the merits. We

## IV.

### DISPOSITION

The order of the trial court denying Quintero's special motion to strike brought pursuant to section 425.16 is hereby vacated, and a new order granting the motion is hereby ordered to be entered. The matter is remanded to the trial court to consider the award to Quintero of attorney fees under section 425.16, subdivision (c).

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied February 22, 2005, and respondent's petition for review by the Supreme Court was denied May 11, 2005.

---

have in mind cases where the petition presents an accurate facial case for injunctive relief, but additional or different evidence presented at the hearing leads the court to deny it (e.g., a case of harassment involving mistaken identity that the defendant was the harasser). As noted, this case does not present that anomalous circumstance.

APPENDIX A

# Why we are flyering your Church

We are here with a group of 21 families who have lost money and suffered enormous anxiety as a result of the actions of Mr. Richard Thomas, a Deacon here at Castro Valley 1st Presbyterian Church.

The CRR has been helping tenants for over four years. We have never come across a landlord who has such a consistent record of not returning security deposits. In the six months of our campaign to help Mr. Thomas' tenants, we have spoken with over a hundred tenants. We have NOT yet met ONE tenant who feels Mr. Thomas has treated them fairly.

We want you to know some things about Richard Thomas that we assume you don't know. We also would like any help we can get to try to stop Mr. Thomas' unfair actions against his tenants. Please help us to make this world a better place for the working people and poor who are Mr. Thomas' tenants.

**Security Deposit Rip-off –ometer**

$ 50,000
$ 40,000
$ 30,000
$ 20,000
$ 10,000

Sunday
April 27th 2003.

## What's under Richard Thomas' Roof?

1. The Campaign for Renters Rights (CRR) has discovered and helped organize 21 former tenants of Richard Thomas who were not given their deposit back. The full amount owed to this group is $ 35,716. When attempting to get their deposits back, a large number have been threatened or actually countersued by multi-millionaire Richard Thomas. In the 21 cases' implied, threatened or actual countersuits total over $ 40,000. Many tenants believe this $75,000 is simply the rich stealing from the poor.
2. Richard Thomas was characterized by Alameda County Judge Stein (8.26.99) as a "vexacious litigant" and "malicious and despicable." Case (#746774).
3. Richard Thomas was successfully sued by a former lawyer for $800,000. Of the 13 lawyers Mr.Thomas has fired, a number of them are suing him for malicious prosecution.
4. Richard Thomas was the first big public case of Just Cause Oakland because of his pattern of evicting tenants for profit ( to get around Oakland's rent law). He has been sued by the city of Oakland for his admitted violations of the rent code. Case #831363-2
5. Richard Thomas has also been sued by the City of San Rafael for $19,000 for refusing to repair housing that he rents in that city. He has been deemed a slumlord there.
6. Richard Thomas, in the last five years, has filed Unlawful Detainers (eviction notices) against 142 families.
7. Richard Thomas' stated net worth is $ 23 m. Most believe his net worth is closer to $ 40 m.

**Campaign for Renters Rights 510 595 5545 Fight to Win with Direct Action**

**Please join us on our picket. Many current tenants were too scared to be here. But join former Thomas tenants and the Campaign for Renters Rights to fight for justice and an end to the rich beating up on the poor.**

APPENDIX A

APPENDIX B

 **(. . . . . Richard Thomas style)**
## Allyson could be jailed for being here today

Allyson Hollingsworth, former Resident Manager, attempted to expose landlord Richard Thomas' unfair actions. Thomas is using the courts to prevent her telling her story.

# A message to Church members and the Castro Valley community

**Brothers and Sisters:**

We visited your church one month ago to inform you of the shameful record of Richard Thomas, a landlord and elder in your church. Mr. Thomas didn't like the fact that we informed you of his consistent practice of keeping his tenants security deposits.

We told you of the 27 cases we know of where Mr. Thomas refused to return tenant's deposits. We explained that when people tried to use the legal system to get their deposits back, a large number were threatened or actually counter-sued by multi-millionaire Richard Thomas. In the 27 cases, implied, threatened or actual counter-suits potentially total over $70,000. Many tenants believe this is simply the rich stealing from the poor. Mr. Thomas worth has been estimated at up to $44 million.

The CRR assumes that members of this congregation have certain expectations from their leaders. Mr. Thomas' business practices bring misery and uncertainty to the lives of honest hard working people and their families.

Since our previous excercising of our 1st Amendment rights at this church, Mr. Thomas has increased his efforts to silence former tenants who are activists Mr. Thomas is trying to restrict our 1st Amenment rights through the courts. He has brought an unreasonable and unjustified restraining order against one of us in an attempt to intimidate and silence us all. This is not unexpected. Mr. Thomas as was characterized by Alameda County Judge Stein (8.26.99) as a "vexatious litigant" and "malicious and despicable." (Case #746774).

We will not allow Mr. Thomas' misuse of the legal system to prevent us from exercising our constitutional rights. The CRR and former tenants had hoped that the leaders and members of 1st Presbetryian Church would be concerned atthe behavior of one of their elders, Mr. Thomas; that they would be willing to meet with us to explore these concerns further.

Unfortunatly, the leaders of this church have apparently decided to side with Mr. Thomas without hearing from those he abuses. By their deeds ye shall know them as the saying goes. The leaders of 1st Presbyterian are complicit with Richard Thomas by supporting his unChristian business practices.

The importance of this matter cannot be understated. Mr. Thomas' actions hurt people. The CRR is asking the members of this congregation to see to it that their elders look in to the practices of a church offical and meet with those of us who are bringing this to their attention. The CRR is willing to meet to discuss this unfortunate situation with any member or group from this Church.

## What You Can Do

Don't look the other way! Phone the Church (581-6203) and ask why they've refused to talk to the tenants. This FRIDAY at 9.30am, show your solidarity against this censorship by the rich against the poor, at Dept 4, Superior Court, 1225 Fallon, Oakland.

# ★Campaign for Renters Rights 595 5545★