Filed 9/18/23; Modified and Certified for Pub. 10/4/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JACQUELYNN L. HANSEN, | B311524 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STRO05408) |
| v. | |
| OLEG VOLKOV, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Christine Byrd, Judge.  Reversed and remanded with directions.

Oleg Volkov, in pro. per., Defendant and Appellant.

Buchalter and Robert Collings Little for Plaintiff and Respondent.

_____

Jacquelynn L. Hansen and Oleg Volkov, both members of the State Bar, represent opposing parties in a dissolution/annulment proceeding pending in Los Angeles Superior Court (*Wright v. Platokhina* (Super. Ct. L.A. County, 2019, No. 19STFL03890)).  Following an incident at Hansen's office relating to the canceled deposition of Volkov's client, Iuliia Platokhina, Hansen obtained a three-year civil harassment restraining order pursuant to Code of Civil Procedure section 527.6 (section 527.6), protecting her, as well as her paralegal and office receptionist, from further harassment by Volkov and authorizing Volkov in connection with his representation of Platokhina to contact Hansen only by United States mail or email and only for purposes of service of legal papers.

On appeal Volkov contends, in part, that all of the conduct upon which the trial court based its findings of harassment was constitutionally protected activity (litigation-related emails and his appearance at Hansen's office for his client's deposition) and there was insufficient evidence his actions, to the extent not constitutionally protected, were directed at Hansen, caused Hansen substantial emotional distress, or would cause a reasonable person substantial emotional distress as required to support issuance of the restraining order.  Volkov also contends the court erred in including in the order members of Hansen's office staff as protected individuals.  We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Hansen's Request for Civil Harassment Restraining Orders*

Hansen filed her request for civil harassment restraining orders on October 2, 2020 and included, without notice to Volkov,

a request for issuance of a temporary restraining order. In the portion of the Judicial Council form permitting the petitioner to request protection for other family or household members, Hansen asked that two of her employees, Anita Collette Darby (her receptionist) and Robin Rouse (a paralegal), be included as protected individuals.

In her declaration in support of the request for orders, Hansen explained that she represents Philip Wright in family law proceedings in which Volkov represents Platokhina. Platokhina had alleged Wright engaged in domestic violence, and Volkov represented Platokhina in a failed effort to obtain a domestic violence restraining order. Prior to the hearing in that matter, Wright was unsuccessfully prosecuted by the Los Angeles City Attorney for domestic violence against Platokhina. Volkov "appeared throughout the criminal proceedings and was 'booted' from the Courtroom at the request of Larry M. Bakman [Wright's counsel] for allegedly recording the proceedings in violation of the Superior Court rules." According to Hansen, "Since the dismissal/loss of the criminal proceedings, Mr. Volkov has been aggressive, harassing and threatening toward myself, my co-counsel, Larry M. Bakman, my client and my client's family."

Hansen declared she was scared of Volkov because he repeatedly came to her office ("no less than five (5) times over the last year"), insisted on speaking to an attorney about the pending family law matter and refused to leave despite demands by her office staff. Hansen attached as an exhibit a letter sent to Volkov on October 31, 2019 (that is, approximately one year prior to the request for the restraining order), which, after asserting that Hansen's objections to Volkov's written discovery had been timely served, stated, "I understand you recently came to my office and

3

badgered my staff as well about the discovery objections.  Your conduct is unbefitting of an attorney.  I understand your position regarding discovery.  Please do not harass me or my staff any further."

Hansen's declaration then described the October 2, 2020 incident, summarizing in part the accompanying declarations of Rouse and Darby concerning the events of the morning.  Hansen's declaration attached as exhibits a September 29, 2020 letter (sent via email) canceling Platokhina's deposition, previously scheduled for October 2, 2020, because Volkov had failed to confirm his client would appear, and a portion of the email exchange between Hansen and Volkov restating the deposition had been canceled.  Notwithstanding notice that the deposition had been canceled, Platokhina appeared at Hansen's office at 9:05 a.m. on October 2 for the deposition.  Rouse informed Platokhina the deposition had been canceled, as Volkov had been advised, and asked her to leave, which she did.  Volkov then arrived a few minutes later.  Volkov walked past Darby in the suite's waiting room and entered the inner office area.  (Hansen noted that three of her children were in the conference room attending school remotely when Volkov entered the office.)  Rouse saw Volkov and told him he had to return to the waiting room.  Once the two of them were in the reception area, Rouse told Volkov there was no deposition and he had to leave.  Volkov responded he would not leave until he received written confirmation there was no deposition.  Rouse again told Volkov he needed to leave and added, "There are children here."

According to Hansen, she entered the suite at this point, saw Volkov in the waiting room and repeatedly demanded he immediately leave the office.  Hansen held the door open for him.

4

As Volkov began walking toward the door, he started recording the interaction on his phone. Volkov then leaned his body into the door so it would not close and claimed Hansen had hurt him with the door (apparently because she had released her grip on the self-closing door as he was walking out of the suite and it struck him). After Volkov left, Hansen locked the door and asked Darby and Rouse what had happened prior to her arrival. She then called the 911 emergency number and reported what had happened. Hansen concluded her declaration by stating she believed she, her family and her staff needed protection from Volkov "as he routinely comes to my place of business and refuses to leave, despite my repeated requests." She added, "His filming of me without my permission and false allegations that I 'hurt' him are also equally threatening/harassing."

The court issued a temporary restraining order on October 2, 2020 and set Hansen's request for a permanent civil harassment restraining order for an evidentiary hearing.

2. *The Hearing on Hansen's Request for Civil Harassment Restraining Orders*

The hearing on Hansen's request was held December 4, 2020.[1] Both Hansen and Volkov were represented by counsel. Hansen's and Rouse's declarations were received in evidence,

---

[1] Volkov apparently filed a response to Hansen's request for civil harassment restraining orders although, as Volkov stated in his request to augment the record with a copy of that response, the filing is not reflected in the superior court's register of actions, and the copy provided with the motion to augment does not including any notation reflecting that it had been filed. Nonetheless, Volkov's counsel at the hearing stated the response was included in the exhibit binder provided to the court.

subject to cross-examination.  Hansen, Volkov and Rouse were present and testified.

a. *Volkov's testimony*

Volkov, originally testifying as the first witness in Hansen's case-in-chief pursuant to Evidence Code section 776, subdivision (a), explained he personally served all documents in the family law case between Platokhina and Wright rather than using an attorney service.  He denied he went to Hansen's office with the intent to annoy and harass her.

Turning to the events leading to the incident on October 2, 2020, Volkov acknowledged he had received via email, apparently sent at 2:12 p.m. on September 29, 2020, Hansen's letter stating Platokhina's deposition, scheduled for October 2, 2020, had been canceled because of Volkov's objections.  But, he continued, he understood from Hansen's subsequent email sent at 2:48 p.m. on September 29, 2020 that the deposition had not actually been canceled.  Volkov explained he had emailed Hansen at 2:46 p.m. stating, "We clearly have communication issues.  I clearly stated that I and my client are going to follow the law."[2]   Hansen responded in her 2:48 p.m. email, writing, "I do not understand your statement—'I am going to follow the law'—please tell me whether you and your client will be appearing in person on Friday at my office at 10 am."  Then at 3:00 p.m. Hansen again emailed, saying, "Mr. Volkov—at this juncture, given your gamesmanship.  We will simply file the Motion to Compel your

---

[2]     The 2:46 p.m. email followed one at 2:40 p.m. from Volkov stating, "I and my client will follow the law and appear at the deposition.  I've never stated that either I or my client refused to appear."

6

client's deposition on a date certain with a discovery referee to be present at the sole cost of your client. [¶] No further communication on this is necessary." Volkov sent several further emails indicating he and his client intended to appear for the deposition. Hansen did not respond to him after her 3:00 p.m. email.

Volkov testified that, when he arrived at Hansen's office on the morning of October 2, 2020, he asked the receptionist about the deposition. The receptionist responded that he should speak to Rouse and pointed toward Rouse's office, which Volkov believed to be an invitation to walk into the interior of the suite. Rouse came out of her office and asked Volkov to leave the inner area of the suite and go to the waiting room. After he returned to the reception area, Hansen came into the suite and immediately yelled at Volkov to leave. Volkov was in the process of drafting an email to confirm he had appeared for the deposition when Hansen ordered him out of the office. He then described how his foot was caught in the door as he was leaving.

During direct examination during the defense case, Volkov testified he was in Hansen's suite for approximately two minutes on October 2, 2020 from the time he entered until he was hit by the door. Volkov also explained he insisted on confirming he and his client had been present that morning because he did not trust his opposing counsel: "I was afraid that they would claim that I, my client, didn't appear at the deposition." Volkov began drafting an email on his phone, but Rouse told him to take a video of the office rather than writing the email to memorialize his appearance. At that point Hansen entered the suite and demanded Volkov get out.

7

b. *Hansen's testimony*

In her testimony Hansen identified her October 31, 2019 letter to Volkov and explained she had sent it on behalf of her employees, who had complained about Volkov's appearance at the office and demand to speak to them. Hansen estimated Volkov had been at the office at least five times before she wrote the letter. In the 11 months since writing the letter, Volkov had come to her office "three or less" times; and her employees complained that Volkov was "creepy, he won't leave, he demands to talk to the attorney." Hansen conceded that, although she may have been in the office when Volkov was there after October 31, 2019 and before October 2, 2020, she did not communicate with him on any of those occasions, including personally asking him to leave.

Hansen next testified about setting Platokhina's deposition for October 2, 2020, Hansen's letter of September 29, 2020 canceling the deposition, the subsequent email that reiterated the deposition had been canceled, and her belief that there was absolutely no reason for Volkov to be at her office on October 2, 2020. She explained, because of a blackout at her home, she brought her children (eight, nine and 11 years old) to the office to continue their remote schooling in the conference room and then took her youngest child to preschool. While at the preschool, she received a text that said, "Volkov is here." When she received that message, Hansen felt "sick to her stomach" and "scared" because "I was afraid he wouldn't leave and my kids were sitting there."

Hansen returned to the office, went upstairs to her suite, opened the door and said to Volkov, "Leave." Volkov was typing on his phone as Hansen repeatedly told him to get out of her

8

office and said she would call the police if he refused. She then described the episode with the door and Volkov's recording of her as he screamed he had been hurt by the door closing on him. Asked how she felt after Volkov left, Hansen stated, "I felt horrible that I put all these people in this situation, especially my kids."[3]

Hansen also testified that, subsequent to October 2, 2020, her building management contacted her and reported that Volkov had requested any video recordings from that morning of Hansen's floor, building lobby and parking garage. That request, she testified, made her "scared that he was trying to get more information about me." Hansen's counsel explained he was not offering that testimony for the truth but only for Hansen's state of mind.

On cross-examination Hansen acknowledged that, when Volkov came to her office prior to October 2, 2020, "he has served paperwork," before "demand[ing] to speak to an attorney in the office, and he has refused to leave until somebody comes out to speak to him, an attorney." Asked to review the series of emails that preceded the October 2, 2020 confrontation, Hansen explained that she had clearly canceled the deposition, did not understand what Volkov meant when he said he would "follow the law and appear at the deposition," and did not believe it was

---

[3] Rouse testified she was afraid when Volkov refused to leave the office, explaining, "It was just me, Collette [Darby], who, you know, we were both standing back. We were a little nervous. And then the three children. And it's a little worrisome when somebody won't leave. I didn't know what was going to happen." According to Hansen, Darby was "very upset" after Volkov finally left.

necessary to continue to discuss the matter with Volkov once the deposition had been canceled.

### c. *Rouse's testimony*

Rouse testified (consistently with the description of the October 2 incident in her declaration as summarized by Hansen) that, when she saw Volkov in the inner office area, Volkov said he was there for his client's deposition. Rouse asked him to go back to the reception area where she then told him the deposition had been canceled, as he knew, and he had to leave. Volkov said he needed confirmation he had appeared for the deposition and began using his phone to type an email. Rouse told him he could prepare his email downstairs (that is, not in Hansen's office suite), but Volkov ignored her. According to Rouse, Volkov was in the office for approximately 10 minutes before Hansen arrived. Once there, Hansen repeatedly asked Volkov to leave and held the door open for him. Volkov started walking very slowly toward the door. As he reached the door frame, he used his body to stop the door from closing, held his phone up as if he was recording, and said, "You're hurting me; you're hurting me."

### 3. *The Trial Court's Findings and Order*

At the conclusion of the hearing the court signed a three-year civil harassment restraining order protecting Hansen, Darby and Rouse from Volkov, which included a general prohibition against any contact, direct or indirect, and ordered Volkov to stay at least 100 yards away from each of them, as well as Hansen's home, workplace and vehicle and her children's school and place of child care. The order additionally provided that Volkov, in connection with his representation of Platokhina in the family law proceedings, was allowed to contact the protected individuals by United States mail and email "for

purposes of service of legal papers only.  No other contact of any kind without authorization in advance by court order for such contact."

Detailing its findings at the hearing, the court stated that Volkov had "engaged in a course of conduct directed at petitioner, Ms. Hansen, that seriously alarmed, annoyed, or harassed her; that it was knowing and willful; that it served no legitimate purpose; that it was not constitutionally protected; that it would cause a reasonable person to suffer substantial emotional distress; and that it did actually cause substantial emotional distress to the petitioner."  The court also found it highly probable the conduct would continue in the future unless a restraining order issued.  The court, after explaining it found Hansen's and Rouse's testimony to be credible and Volkov's testimony not credible, specifically found Volkov's emails leading up to the October 2, 2020 incident to be "civil harassment, without question," describing the multiple emails as "argumentative and self-serving and entirely unnecessary and part of a course of conduct of civil harassment. . . .  There was no reason for respondent to be sending email after email after email after a clear and unequivocal cancellation of the deposition.  That in itself establishes a course of conduct."  Continuing, the court stated, "It was entirely unreasonable for him to appear at the office on October 2nd.  There was no legitimate purpose for him being there, and his conduct by coming to the office was more in the course of conduct of civil harassment."

Volkov filed a timely notice of appeal.[4]

---

[4]     Volkov filed his notice of appeal on February 2, 2021. Volkov had previously filed a motion for a new trial (on January 8, 2021), which was not heard until February 8, 2021

11

**DISCUSSION**

1. *Governing Law and Standard of Review*

Code of Civil Procedure section 527.6, subdivision (a)(1), provides, "A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section." Subdivision (b)(3) of section 527.6 defines harassment as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose."

A "'[c]ourse of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means . . . ." (§ 527.6, subd. (b)(1).) "The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).) "Constitutionally protected activity is not included within the meaning of 'course of conduct.'" (§ 527.6, subd. (b)(1).)

At the hearing on a petition for a civil harassment restraining order, the court "shall receive any testimony that is relevant, and may make an independent inquiry." (§ 527.6, subd. (i).) The trial court may issue a restraining order only after finding by clear and convincing evidence that unlawful

---

when the court denied the motion. Volkov's appeal does not challenge the denial of his new trial motion.

12

harassment exists and is reasonably likely to recur.  (§ 527.6, subd. (i) [requiring showing "by clear and convincing evidence"].)

"'Section 527.6 was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution."  [Citations.]  It does so by providing expedited injunctive relief to victims of harassment.'"  (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; accord, *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.)  After finding harassment, upon a showing of good cause, the court may include named family or household members in the restraining order.  (§ 527.6, subd. (c).)[5]

"[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing

---

[5]     The trial court, referring to section 527.6, subdivision (b)(6)(A)(i) & (ii), which authorizes the court to grant the petitioner exclusive control of an animal owned by or residing with the petitioner and to order the respondent to stay away from the animal, included Hansen's office staff in the civil harassment restraining order because, as the court stated, it was uncomfortable that the legislation offered more protection to a household pet than to the petitioner's employees.  Neither that rationale nor the court's additional finding that Hansen's employees were sufficiently similar to family or household members justified naming a petitioner's employees as protected individuals in a section 527.6 restraining order.  Rouse and Darby could have filed requests for a civil harassment restraining order, or Hansen could have sought a workplace violence protective order pursuant to Code of Civil Procedure section 527.8 to safeguard her employees if she believed the somewhat different requirements prescribed by that statute could be satisfied.

13

evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005.) "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

"[W]hether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review." (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188; accord, *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

### 2. *Volkov's Emails Regarding His Client's Deposition Constituted Constitutionally Protected Activity*

As discussed, the trial court expressly found the multiple emails sent by Volkov after Hansen had notified him that Platokhina's deposition was canceled were "argumentative and self-serving and entirely unnecessary." Perhaps they were, and maybe also seriously annoying. But they did not contain any threats of violence (credible or otherwise). As such, Volkov's emails were constitutionally protected litigation activity. (See *Finton Construction, Inc. v. Bidna & Keys, APLC* (2015) 238 Cal.App.4th 200, 210 ["'all communicative acts performed by attorneys as part of their representation of a client in a judicial

14

proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute'"]; *Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480 [same]; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [litigation activities, including filing and prosecution of a lawsuit by an attorney representing a client, constitute acts in furtherance of a person's right of petition or free speech]; *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537 ["anti-SLAPP protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with . . . litigation"].)

Because the emails were constitutionally protected, it was error for the court to conclude they were properly considered part of a course of conduct of harassment. (§ 527.6, subd. (b)(1) ["[c]onstitutionally protected activity is not included within the meaning of 'course of conduct'"]; see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 663 [even if petitioner had been seriously alarmed, annoyed or harassed by respondent's conduct—a public demonstration at petitioner's church protesting petitioner's eviction of respondent—there was no showing that respondent's injurious actions were part of a "course of conduct" within the meaning of section 527.6 because the conduct constituted a form of protected speech].)

3. *The Evidence of Volkov's Nonprotected Conduct Did Not Support the Court's Findings of a Willful or Knowing Course of Conduct That Would Cause a Reasonable Person, and Did Cause Hansen, Substantial Emotional Distress*

Other than Volkov's pre-deposition emails, the trial court identified only the incident at Hansen's office on October 2, 2020

15

to support the findings that Volkov had willfully or knowingly engaged in a course of conduct directed at Hansen that seriously alarmed, annoyed or harassed her and that would have caused a reasonable person to suffer serious emotional damage.[6]  Based on the court's credibility findings we accept, as we must, Hansen's and Rouse's version of the incident—that is, Volkov came to Hansen's office knowing the deposition had been canceled and without any other legitimate reason to be there, remained at the office for approximately 30 minutes despite repeated demands that he leave and then feigned injury and recorded Hansen without permission when the door Hansen had been holding open struck Volkov as he slowly left the suite.  (Hansen concedes on appeal, as Volkov testified, that Volkov had no reason to know that Hansen's children would be at the office on the morning of October 2, 2020.)

---

[6]     The trial court did not identify as part of Volkov's course of conduct of harassment his several pre-October 2, 2020 visits to Hansen's office during which he served legal papers and demanded to speak to an attorney about his client's family law case.  Nor could it have properly done so.  Even if this litigation-related conduct did not constitute constitutionally protected speech and petitioning activity, there was no evidence Volkov's actions were directed to Hansen, who admitted during the evidentiary hearing that she never spoke to, or otherwise interacted with, Volkov on any of those occasions.  Indeed, in her October 31, 2019 letter to Volkov Hansen described his conduct at the office after serving papers as "badger[ing] my staff as well about the discovery objections," and Hansen testified she wrote the letter because of her employees' concerns and complaints that Volkov was "creepy."

16

This evidence was insufficient for a reasonable trier of fact to make the findings necessary to support the restraining order with the high probability demanded by the clear and convincing standard of proof. (See *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1005.) Although "[s]ection 527.6 does not define the phrase 'substantial emotional distress,'" in "the analogous context of the tort of intentional infliction of emotional distress, the similar phrase 'severe emotional distress' means highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.'" (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762-763; accord, Cal. Judges Benchguides, Benchguide 20, Orders Prohibiting Civil Harassment and Workplace/Postsecondary School Violence (CJER 2016) § 20.6 [Definitions], pp. 20-7 to 20-8.) Here, Hansen testified only that she felt sick to her stomach and scared that Volkov would not leave when she received the text message that Volkov was at her office and felt horrible once Volkov left because she had put others (her staff and her children) in this situation. That testimony was far from establishing that Volkov's conduct, however offensive or annoying it may have been, caused Hansen—an experienced family law attorney who presumably has litigated many cases with difficult opposing counsel—to suffer intense, enduring and nontrivial emotional distress.

But even were we to agree the evidence supported a finding that, as a result of the October 2, 2020 episode, Hansen suffered, and a reasonable person in her position would have suffered, substantial emotional distress within the meaning of section 527.6, a "single incident" is "insufficient to meet the

17

statutory requirement of a course of conduct." (*Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4; accord, *Brekke v. Wills*, *supra*, 125 Cal.App.4th at pp. 1413-1414; Cal. Judges Benchguides, Benchguide 20, *supra*, § 20.6, at p. 20-7.) The trial court in its findings referred to Volkov's presence at Hansen's office as a singular event ("his conduct in coming to the office") and found it "more in the course of conduct of civil harassment" established by the pre-October 2, 2020 emails. Considered on its own, the 30-minute episode (if, in fact, it lasted that long) does not support issuance of the civil harassment restraining order.

Although we reverse the civil harassment restraining order because Volkov's conduct was partially protected and failed to cause Hansen severe emotional distress, that does not mean his behavior was appropriate. Nor was it appropriate for Hansen to seek a civil harassment restraining order against her opposing counsel based on an argument over deposition scheduling that reasonable attorneys could have resolved without court intervention or because her office staff considered Volkov "creepy" or annoying. Counsel's mutual lack of civility in this case lends all the more support for the recommendations of the California Civility Task Force, which warned that "[d]iscourtesy, hostility, intemperance, and other unprofessional conduct prolong litigation, making it more expensive for the litigants and the court system." (Beyond the Oath: Recommendations for Improving Civility, Initial Report of the California Civility Task Force (Sept. 2021) p. 2.) Indeed, one of the Task Force's recommendations would have been particularly helpful in this case: requiring attorneys to take an hour of mandatory continuing legal education devoted to civility. (*Id.* at p. 3.) As the Task Force concluded: "Civility matters not simply because

18

lawyers are examples to others on how to engage competing ideas and interests.  It matters because our system of justice simply cannot function fairly and reliably with systemic incivility."  (*Id.* at p. 6.)

## DISPOSITION

The civil harassment restraining order issued December 4, 2020 is reversed.  On remand the trial court is directed to enter a new order denying Hansen's request for a restraining order.  The parties are to bear their own costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

MARTINEZ, J.

19

Filed 10/4/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JACQUELYNN L. HANSEN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OLEG VOLKOV,<br><br>    Defendant and Appellant. | B311524<br><br>(Los Angeles County<br> Super. Ct. No.<br>20STRO05408)<br><br>ORDER MODIFYING<br>OPINON AND<br>CERTIFYING OPINION<br>FOR PUBLICATION<br>(No change in the<br>appellate judgment) |

THE COURT:

It is ordered that the opinion filed herein on September 18, 2023 be modified as follows:

1.  On page 2, at the end of the second full paragraph, strike the words, We reverse.

2.  On page 2, insert a new third paragraph that reads:

We reverse the restraining order. However annoying they may have been, Volkov's emails regarding his client's deposition constituted constitutionally protected activity that may not be considered part of a course of conduct of harassment. The remaining evidence of his unprotected conduct did not support the trial court's finding that Volkov had engaged in a willful or knowing course of conduct that would cause a reasonable person substantial emotional distress.

3.  On page 15, in heading 3 replace Nonprotected with Unprotected.

There is no change to the appellate judgment.

The opinion in this case filed September 18, 2023 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the nonparty's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.          SEGAL, J.          MARTINEZ, J.